Kalman J. BERENYI, Petitioner,
Appellant,

v.

DISTRICT DIRECTOR, IMMIGRATION
AND NATURALIZATION SERVICE,
Respondent, Appellee.

No. 6531.

United States Court of Appeals
First Circuit.

Heard Oct. 4, 1965.

Decided Nov. 1, 1965.

Charles Spar, New York City, with whom Leon B. Savetsky and Spar & Burroughs, New York City, were on brief, for appellant.

Stanislaw R. J. Suchecki, Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE, Circuit Judge, and CAFFREY, District Judge.

McENTEE, Circuit Judge.

This is an appeal by one Kalman J. Berenyi from a final order of the United States District Court for the District of Massachusetts denying his petition for naturalization. The petitioner, a Hungarian national, was born in Budapest in 1928. He received his early education there and in 1946 entered the Medical School at the University of Budapest. The Russian troops first occupied Hungary in 1945 and it is apparent from the record that during the time of the petitioner's attendance at the university it had become subjected to strong Com-

munist influence and pressure. In 1949, while still a student at the medical school, the petitioner joined the Hungarian army which was then under Communist domination and control. While in the army he continued his medical studies at the university and after graduation in 1952 became a medical officer. When he left the army in 1956 he had attained the rank of captain. The petitioner did not participate in the unsuccessful Hungarian uprising against the Russians in 1956 but in the confusion that resulted from it he and his wife fled from Hungary into Austria in the fall of 1956 and from there came to this country. The record shows that they were admitted to the United States for permanent residence on December 4, 1956. Immediately after his arrival here the petitioner resumed his medical career in various hospitals in New York and New Jersey and moved to Massachusetts in 1959 where he and his wife presently reside.

On January 30, 1962, the petitioner filed his "Application to File Petition for Naturalization" in the United States District Court in Boston. This application, which was made under oath, contained amongst others, the following question:

"Have you ever, in the United States or in any other place (a) been a member of, or in any other way connected with, or associated with the Communist party either directly or indirectly through another organization, group or person?"

To this question the petitioner answered "No." The record further shows that a few days later on February 2, 1962, in Boston, the petitioner stated under oath to an officer of the Immigration and Naturalization Service in connection with his said application that he had never been a member of the Communist party either in the United States or in any other country. On May 22, 1962, the petitioner again testified under oath before an officer of the Immigration and Naturalization Service, this time in connection with his petition for naturalization, that he had never been a member of the Communist party. The naturaliza-

tion examiner who conducted the preliminary hearing in this case, after a review of the evidence found the above statements to be false and recommended that the petition for naturalization be denied under 8 U.S.C. §§ 1101 and 1427, the pertinent portions of which are hereinafter set forth. Thereupon, on demand of the petitioner, the district court required the examination of the petitioner and witnesses under oath before the court and in the presence of the court pursuant to 8 U.S.C. § 1447(b). At this hearing the petitioner testified at length and also produced several witnesses in support of his petition. The respondent produced two witnesses in opposition thereto. The record of the preliminary hearing before the naturalization examiner was also before the court by agreement of the parties. On the issue of whether the petitioner had ever been a member of the Communist party in Hungary, the first government witness, Dr. Pal Halasz, testified that he had attended the University of Budapest Medical School between 1949 and 1955 and knew the petitioner while there; that he himself had been a member of the Communist party between 1948 and 1956; that while he was at the university Communist party meetings were held there about once a month; that he did not attend all of them but that he saw the petitioner at some meetings in 1950 or 1951. The second government witness, Dr. Gyorgy Kury, testified that he was a classmate of the petitioner at the medical school; that the witness was assigned to a small group of about twenty students which met every afternoon for the purpose of study of medical subjects and also for political orientation; that the petitioner was also a member of this group; that in September of 1948 Kury attended a meeting of this group at which he heard the petitioner tell the group that he was a member of the Communist party since 1945 following the Soviet occupation of the country; that he was to be their instructor in Marxism-Leninism and was responsible for their ideological education; that the petitioner also encouraged the

group to read Soviet books, see Soviet movies and discuss the news.

The petitioner testified that he had never been a member of the Communist party of Hungary or of any other country and denied ever having made the statements attributed to him by Dr. Kury or that he was ever a political leader of any student or other group. He further testified to his opposition to Communism, his loyalty and attachment to the United States and his willingness to bear arms for this country. For the most part, the witnesses for the petitioner testified to statements made by the petitioner to them individually during the period between 1949 and 1956 of his opposition to Communism and his love for freedom.

In addition to other findings of fact, the court found that the petitioner became a member of the Communist party in Hungary in 1945 and remained a member for an indefinite number of years; that in the three instances above mentioned the petitioner gave false testimony for the purpose of facilitating his naturalization and obtaining the benefits of United States citizenship and therefore was not a person of good moral character within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1101(f) (6) and § 1427(a) (3).[1] On the basis of these findings the court concluded that the petitioner had failed to establish his compliance with the statutory requirement of good moral character and denied the petition.

■ It is well settled that the petitioner in these cases has the burden of proving that he possesses each of the statutory qualifications for citizenship.

United States v. Schwimmer, 279 U.S. 644, 649, 49 S.Ct. 448, 73 L.Ed. 889 (1929). A good moral character during the five year period immediately preceding the filing of his petition for naturalization is one of these statutory qualifications. 8 U.S.C. § 1427(a). No person who has given false testimony during this period for the purpose of obtaining any benefit under the Immigration and Nationality Act shall be regarded as, or found to be a person of good moral character. 8 U.S.C. § 1101(f) (6).

■ This petitioner as a part of his original application for a petition for naturalization and also in connection with his petition for naturalization itself, flatly stated that he had never been a member of the Communist party in Hungary or elsewhere. The government introduced testimony contradicting these statements. The petitioner's oath subscribing to his petition made out a prima facie case that his character was good. Krausse v. United States, 194 F.2d 440 (2d Cir. 1952). "Prima facie" evidence does not shift the burden of proof, see Commissioner v. Young Motor Co., 316 F.2d 267, 271 (1st Cir. 1963), but it did impose a burden on the government of going forward. Krausse v. United States, supra; see Epstein v. Boston Housing Authority, 317 Mass. 297, 302, 58 N.E.2d 135, 1944, and cases cited. The court's belief of the evidence that petitioner had been a Communist adequately satisfied that burden. As a result the district court found that the petitioner failed to sustain his burden of proof. We must affirm unless we find that this determination was clearly erroneous, and in our consideration of that

1. The pertinent portions of 8 U.S.C. § 1101 provide:

"(f) For the purposes of this chapter—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

"(6) one who has given false testimony for the purpose of obtaining any

benefits under this chapter; * * *."
8 U.S.C. § 1427 provides:

"(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, * * * (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

question we must accord due weight to the opportunity of the district judge to observe the conduct and demeanor of the witnesses and particularly the conduct, demeanor and credibility of the petitioner himself. On the basis of a careful review of the entire record in this case we cannot find the clear error which we are obliged to find under Rule 52(a) of the Federal Rules of Civil Procedure if we are to set aside the final order of the district court.

Judgment will be entered affirming the order of the district court.