BERENYI *v.* DISTRICT DIRECTOR, IMMIGRA-
TION AND NATURALIZATION SERVICE.

No. 66.  Argued December 5–6, 1966.—Decided January 23, 1967.

*Leon B. Savetsky* argued the cause for petitioner. With him on the briefs was *Charles Spar.*

*Robert S. Rifkind* argued the cause for respondent. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Vinson, Beatrice Rosenberg* and *Ronald L. Gainer.*

MR. JUSTICE STEWART delivered the opinion of the Court.

A provision of the Immigration and Nationality Act requires that an alien who applies for naturalization as a United States citizen must establish that during the five years preceding the filing of his petition he has been "a person of good moral character." [1]   Another provision

---

[1] Section 316 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 242, 8 U. S. C. § 1427 (a), provides:

"No person, except as otherwise provided in this title, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that

specifies that no applicant may be found to be a person of good moral character who, within that period, "has given false testimony for the purpose of obtaining any benefits" under the Act.[2] The petitioner, an alien who entered this country from Hungary in 1956, filed a petition for naturalization in the United States District Court for the District of Massachusetts in 1962. At the final hearing the Attorney General appeared by counsel in opposition to the petition.[3] Following this hearing the District Judge denied the petition, finding that the petitioner had testified falsely to facilitate his naturalization, and therefore could not, under the law, be found to be a person of good moral character within the statutory period.[4] The Court of Appeals affirmed,[5] and we granted certiorari.[6]

---

time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

[2] Section 101 (f), 66 Stat. 172, 8 U. S. C. § 1101 (f):
"For the purposes of this Act—No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was— . . . (6) one who has given false testimony for the purpose of obtaining any benefits under this Act . . . ."

[3] Such an appearance is authorized by § 336 (d) of the Act, 66 Stat. 258, 8 U. S. C. § 1447 (d).

[4] 239 F. Supp. 725.

[5] 352 F. 2d 71. The Court of Appeals referred to Rule 52, Fed. Rules Civ. Proc., which provides in relevant part:
"Findings by the Court. (a) Effect. . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

[6] 384 U. S. 903.

During the preparation of his application to file a petition for naturalization, the petitioner was asked the following question: "Have you ever, in the United States or in any other place, (a) been a member of, or in any other way connected with, or associated with the Communist Party either directly, or indirectly through another organization, group, or person?" The petitioner, under oath, answered "No." On two subsequent occasions during the preliminary proceedings on his petition for naturalization, the petitioner again swore that he had never been a member of the Communist Party.

At the final hearing before the District Judge, the Government produced two witnesses whose testimony indicated that the petitioner had been a member of the Communist Party in Hungary. Dr. Pal Halasz stated that he had known the petitioner when they were both students at the University of Budapest Medical School and had seen the petitioner attend Communist Party meetings there on one or more occasions. While such meetings were sometimes open to persons who were not Party members, and Dr. Halasz was not sure that the petitioner was a Party member, his attendance at Party meetings gave Dr. Halasz the impression that the petitioner was a member. Dr. Gyorgy Kury related that he had attended a study group at the University in September 1948. These groups met to discuss Marxist-Leninist ideology, and students were required to attend regardless of Party membership. One student in each group was responsible for leading this discussion. Dr. Kury testified that, at the meeting in question, the petitioner introduced himself as a member of the Communist Party and the student leader responsible for the group's ideological education. Dr. Kury further testified that the petitioner had told the group that he had become a member of the Communist Party after Soviet troops had occupied Hungary in 1945.

634

The petitioner testified that he had never been a Party member or the ideological leader of any student discussion group. He related the heavy pressures on students at the University to attend Party functions and become members, and admitted that these pressures had led him to attend some open Party meetings as a nonmember, but added that he had not been an active participant at these meetings. The petitioner also emphasized his religious upbringing and other factors in his personal life which, he contended, made it unlikely that he would become a Party member. The petitioner's wife testified that he had never been a Party member, and four other witnesses stated that, while in Hungary and after his arrival in the United States, the petitioner had expressed his strong opposition to the Communist Party and the Communist regime in Hungary.

Basing his decision solely on his own evaluation of the testimony adduced at this hearing,[7] the District Judge concluded that the petitioner had become a Party member in 1945 and had remained a member for an indefinite number of years, that the petitioner had attended meetings of the Party, and that he had instructed student study groups in Communist ideology. Accordingly, the court concluded that the petitioner had testified falsely in the preliminary naturalization proceedings, and denied his application for citizenship on the ground that he was, therefore, "not a person of good moral character within

---

[7] A preliminary examination on the petitioner's application for citizenship was held before a naturalization examiner, who transmitted his findings and recommendations to the District Judge, all pursuant to § 335 of the Act, 66 Stat. 255, 8 U. S. C. § 1446. But at the final hearing before the District Court, the judge heard testimony and conducted an independent hearing in accordance with § 336 (b) of the Act, 66 Stat. 257, 8 U. S. C. § 1447 (b), and explicitly declined to rely on any of the preliminary examination materials in reaching his conclusion. 239 F. Supp., at 727.

the meaning of the Immigration and Nationality Act." [8]

The petitioner asks us to reject as "clearly erroneous" the factual conclusion about his Party membership reached by the District Judge and accepted by the Court of Appeals. In order to do so, we would be forced to disregard this Court's repeated pronouncements that it "cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." *E. g., Graver Mfg. Co.* v. *Linde Co.,* 336 U. S. 271, 275. For there was no "very obvious and exceptional" error in the conclusion of the two courts below that the petitioner had been a member of the Communist Party. The testimony of Dr. Kury gave a concrete basis for this conclusion, and that of Dr. Halasz lent it further evidentiary support. The conclusion of the courts below is not inconsistent with the possibility that the petitioner may have harbored a strong opposition to the Party which he bared to his friends. For the petitioner may have

---

[8] At the same time, the judge found the evidence too weak to establish the Government's alternative contention that the petitioner's application should be denied because he had been a Party member within 10 years preceding his application for citizenship in 1962, and thus came within § 313 of the Act, 66 Stat. 240, 8 U. S. C. § 1424, which provides in relevant part:

"(a) . . . no person shall hereafter be naturalized as a citizen of the United States—

.        .        .        .        .

"(2) who is a member of or affiliated with . . . (D) the Communist or other totalitarian party . . . of any foreign state . . . .

.        .        .        .        .

"(c) The provisions of this section shall be applicable to any applicant for naturalization who at any time within a period of ten years immediately preceding the filing of the petition for naturalization or after such filing and before taking the final oath of citizenship is, or has been found to be within any of the classes enumerated within this section, notwithstanding that at the time the petition is filed he may not be included within such classes."

merely joined the Party as a nominal member in deference to the strong pressures which the Party exerted on students to become members, pressures which several witnesses, including the petitioner himself, recited in detail.

The policy underlying the "two-court" rule is obvious. This Court possesses no empirical expertise to set against the careful and reasonable conclusions of lower courts on purely factual issues. When, as here, resolution of the disputed factual issues turns largely on an assessment of the relative credibility of witnesses whose testimonial demeanor was observed only by the trial court, the rule has particular force. To be sure, this Court has not hesitated to undertake independent examination of factual issues when constitutional claims may depend on their resolution. See, e. g., *Napue* v. *Illinois,* 360 U. S. 264, 271–272; *Fiske* v. *Kansas,* 274 U. S. 380, 385–386. Cf. *Hoffa* v. *United States, ante,* p. 293. But this exceptional doctrine has no application to the present case, for the petitioner makes no claim that any constitutional issues are involved here.

Different considerations do not govern merely because this is a naturalization case. When the Government seeks to strip a person of citizenship already acquired,[9] or deport a resident alien and send him from our shores,[10] it carries the heavy burden of proving its case by "clear, unequivocal, and convincing evidence." [11]  But when an

---

[9] *Schneiderman* v. *United States,* 320 U. S. 118; *Nowak* v. *United States,* 356 U. S. 660; *Chaunt* v. *United States,* 364 U. S. 350.

[10] *Woodby* v. *Immigration and Naturalization Service, ante,* p. 276.

[11] The Government has not sought to deport the petitioner because of his affiliations with the Communist Party, and to do so it would be required to prove by "clear, unequivocal, and convincing evidence," *Woodby* v. *Immigration and Naturalization Service, supra,* at 286, that the petitioner had been a Party member who was "meaningfully associated" with it, *Rowoldt* v. *Perfetto,* 355 U. S. 115;

alien seeks to obtain the privileges and benefits of citizen-
ship, the shoe is on the other foot. He is the moving
party, affirmatively asking the Government to endow
him with all the advantages of citizenship. Because
that status, once granted, cannot lightly be taken away,
the Government has a strong and legitimate interest in
ensuring that only qualified persons are granted citizen-
ship. For these reasons, it has been universally accepted
that the burden is on the alien applicant to show his
eligibility for citizenship in every respect. This Court
has often stated that doubts "should be resolved in favor
of the United States and against the claimant." *E. g.,
United States* v. *Macintosh,* 283 U. S. 605, 626.

The petitioner points out that in deportation cases
this Court has held that an alien may not be expelled
from this country on the ground that he has been a
member of the Communist Party unless his participation
in the Party amounted to "meaningful association."
*Rowoldt* v. *Perfetto,* 355 U. S. 115; *Gastelum-Quinones*
v. *Kennedy,* 374 U. S. 469. He contends that the same
rule should apply in the context of naturalization, and
that the Government's proof in this case failed to estab-
lish "meaningful association." But the petitioner's ap-
plication was not denied because of his Communist Party
membership.[12] It was denied because, under oath, he
did not tell the truth. The petitioner was not asked
whether he had been "meaningfully associated" with
the Communist Party. Nor was the inquiry limited to
party membership. He was posed the much broader

---

*Gastelum-Quinones* v. *Kennedy,* 374 U. S. 469. The Government's
evidence in this case fell clearly short of such a showing. Cf. n. 8,
*supra.*

[12] The District Court specifically refused to accept the Govern-
ment's contention that the petitioner was ineligible for naturalization
under the statutory provisions barring Communist Party members
from citizenship. See n. 8, *supra.*

question whether he had ever "been a member of, or in any other way connected with, or associated with the Communist Party either directly, or indirectly through another organization, group, or person." The District Court could rightly have found that the petitioner had not told the truth when he answered this question in the negative if he had not been an actual member, or his membership had been only nominal.

Even assuming that an alien may be denied citizenship on the statutory ground of Party membership only when "meaningful association" is shown, the broader question asked of the petitioner was certainly material and relevant. The Government is entitled to know of any facts that may bear on an applicant's statutory eligibility for citizenship, so that it may pursue leads and make further investigation if doubts are raised. The petitioner has never indicated that he was confused or misled by the scope of the question—that he believed at the time it was asked that the question reached only "meaningful association."

We cannot say that the District Court was wrong in finding that the petitioner had failed to tell the truth. It follows that the Court of Appeals was not in error in declining to upset that finding.

*Affirmed.*

Mr. Justice Douglas, with whom The Chief Justice and Mr. Justice Brennan concur, dissenting.

In this case we are confronted with the spectacle of a person admittedly loyal to the United States, and concededly opposed to communism being denied naturalization because the District Court found that he was not a "person of good moral character." This finding was in turn based upon a subsidiary finding that petitioner had, in the remote past, been a member of the Hungarian Communist Party, and had therefore lied when he stated

that he had never been a member of that Party. The "evidence" upon which the crucial finding of Communist membership was based was slim, ambiguous, and equivocal; and when compared with the overwhelming evidence adduced by petitioner, it is apparent that the finding was *clearly erroneous.*

The Government's case was dependent upon the testimony of two witnesses. Dr. Pal Halasz testified that he had attended medical school in Hungary with petitioner. He did not attend classes with petitioner since he was a number of years behind. The total enrollment of the school was between 1,800 and 2,000. He did not know petitioner socially, but did talk to petitioner and "several times" petitioner helped Halasz with his studies. Halasz was a member of the Communist Party, he "believed" between 1948 and 1956. He could not say how often he attended meetings.[1] According to Halasz, he saw petitioner at some Communist Party meetings, but he did not know how often. He "thought" it was more than once. He did not know what transpired at the meetings, nor did he know whether the particular meetings were *open to nonparty members* or were *open to all.* Most of the meetings were *open to nonparty members and nonmembers were encouraged to attend.* If they did not, they took the risk of retribution. *When nonmembers attended the meetings, they were not identified as nonmembers.* Halasz had never seen petitioner display a membership card, although he had been the doorkeeper at several meetings. He admitted that petitioner was not a "Communist in heart," and that if he said something with respect to communism "it wasn't for the favor of the Communists." He *assumed* that petitioner was a party member because he had seen him at some meetings.

---

[1] Nor could Halasz remember whether he had made a statement to the Naturalization Service inspector under oath.

The second government witness was Dr. Gyorgy Kury who had been in the same medical class with petitioner for one year. The most that this witness could come up with was that he had attended an ideological indoctrination session required to be attended by all students, *members and nonmembers alike.* At that session, he heard petitioner state that he was the session leader and that he had joined the party after the Soviet occupation of Hungary in 1945. He did not remember who had attended the meeting or exactly what petitioner had said. That was his only contact with petitioner. Except for this one occasion, Kury had never heard petitioner say that he was or had been a Communist.

This was the only evidence the Government adduced to show that petitioner had been a member of the Communist Party. The abundance of evidence produced by petitioner can only be briefly summarized. Petitioner unequivocally testified under oath that he had never been a member of the Communist Party and had never attended a *closed meeting.* He did attend *open meetings* to which he had been invited and at which other non-Communists were present.[2] The invitation was tantamount to an order, and nonattendance would result in serious consequences. Attendance of Berenyi at an *open meeting* is the most that is shown. Plainly that is not sufficient to show that he ever had "been a member of, or in any other way connected with, or associated with the Communist Party"—unless as a part of the cold war technique words are to be turned into traps to catch the innocent. And Kury's vague memory that petitioner had joined the Communist Party is belied by every facet

[2] The difference between the so-called closed meeting and the open meeting is described in the testimony which I have attached as an Appendix to this opinion. From that it appears that nonparty members were invited at times even to closed meetings.

of petitioner's character as revealed by a reading of this record.

During the Hungarian uprising in October and November of 1956, petitioner was a member of the Hungarian Army, which he had joined in order to obtain finances to complete his medical education. Communist membership was not a condition for serving in the army. His unit fought the Russians, and petitioner was on duty treating people who were wounded in fighting.

He married a woman whose family's property had been confiscated by the Communist Government; his wife's family left Hungary to escape the Communist regime. His wife testified that she hated communism and the Communist Government of Hungary.

In 1956, petitioner and his wife fled the Communist regime, making their escape at great personal risk. Petitioner testified without equivocation to his opposition to communism, his loyalty and attachment to the United States and his willingness to fight and bear arms in the defense of this country. He absolutely denied making the statement attributed to him by Kury. After his escape, petitioner resumed his medical career in this country, is associated with a number of hospitals and has been a senior instructor on the staff of the Tufts Medical School.

Petitioner's wife testified that both she and petitioner hated communism and the Hungarian Communist Government, and while in Hungary constantly wanted to leave the country for freedom. Lorand De Bickish, a former Hungarian national who is now a naturalized United States citizen, also testified on petitioner's behalf. De Bickish was an avowed anti-Communist who had been arrested twice and imprisoned once for attempting to escape from the Hungarian Communist Government. He testified that he had been exiled to a small town

in Hungary because his brother was a broadcaster for Radio Free Europe. During his exile, petitioner and his wife were the only people to visit him. Petitioner often voiced his opposition to communism and the Hungarian Government. He and petitioner often secretly listened to Radio Free Europe and the Voice of America, and talked of leaving Hungary and escaping to freedom.

Two other witnesses testified that while in Hungary petitioner had often expressed his opposition to communism and the Hungarian Government and his desire to escape to a free country. They testified that, while in the United States, petitioner frequently expressed his gratitude at being here, and his love for the United States and the freedom it offered. It was stipulated that yet another witness would testify that petitioner opposed communism and was attached to the principles of the Constitution.

Thus we are confronted with the curious proposition that the speculations of one witness, and the hazy memory of another witness as to a statement made in the distant past, can outweigh the overwhelming evidence adduced by petitioner, and thereby prevent his naturalization. To me this is tantamount to saying that the Government can merely throw a very slim doubt into the case, and deny naturalization when the applicant fails to disprove the ephemeral doubt. It is no answer to say that the applicant in a naturalization proceeding bears the burden of showing his eligibility for citizenship. The crucial question is what the applicant must do successfully to bear his burden of persuasion. Nor is it an answer to say that doubts should be resolved in favor of the United States and against the applicant. The question is whether a "doubt" is present to be resolved. Must the applicant tilt with every windmill thrown in his path by the Government? In this case there was no "doubt" to be resolved in the Government's favor. If

the Government's sketchy evidence did raise a doubt, the doubt was clearly dispelled by the overwhelming evidence adduced by petitioner. The petitioner did carry his burden of proof and his burden of persuasion. The concurrent findings of two lower courts are not sacrosanct; the "two court finding" rule is no talisman preventing this Court from exercising the duties with which it is charged. This Court can review concurrent findings where there is "a very obvious and exceptional showing of error." *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275. This is such a case.

## APPENDIX TO OPINION OF
## MR. JUSTICE DOUGLAS, DISSENTING.

Pal Halasz, the chief witness against petitioner in the District Court, testified as follows:

"Q. Did you ever see a card showing that Dr. Kalman Berenyi was a member of the Communist Party?

"A. No. I never have seen a card.

"Q. Did he ever tell you or admit to you that he was a member of the Communist Party?

"A. No.

"Q. Did he in any way participate in these so-called meetings of any kind?

"A. Yes.

"Q. In what way?

"A. Well, he had to be there.

"Q. Well, other than put his body into a chair and to sit down at that meeting did he do anything else?

"A. I can't recall.

"Q. Now isn't it a fact that there were many non-communists who were called to these meetings?

"A. Yes.

"Q. And would you say out of a class or group of 40 people, how many would be noncommunists?

"A. I don't know. It depends. Well, from 40 people could be 23 or 24, maybe, not Communists. . . .

"Q. . . . But in this group that you referred to where you claim you saw Dr. Kalman Berenyi how many people would be present?

"A. Well, I would say about 120–150 people.

.    .    .    .    .

"Q. Do you know for a fact, sir, that Kalman Berenyi knew it to be a Communist Party meeting on the occasions when he did attend it, according to your testimony?

"A. You ask me if he knew that was a Communist Party meeting going on. Well, I don't know if he was told or not.

"Q. Now isn't it a fact also that at these so-called meetings indoctrination took place, trying to convert and induce noncommunists to join?

"A. Certainly.

.    .    .    .    .

"Q. Did you ever see a Communist Party book in the possession of Dr. Kalman Berenyi?

"A. No, I did not.

"Q. And did you know from your Party records, if you know of any, that he was listed as a Communist Party member?

"A. I never have seen such a Party record.

"Q. Now, Dr. Halasz, on direct examination you testified that he attended these meetings which you called Communist Party meetings?

"A. Yes.

"Q. Can you tell us with some degree of certainty as to how many meetings you saw Dr. Berenyi at?

"A. No, I can't tell that. Possible I see him maybe two or three times.

"Q. Possibly?

"A. That is all.

"Q. And it could have been once?

"A. It could be more or it could be once?

"Q. You kept no records on it?

"A. No.

"Q. And he was not active in anything? He just sat there?

"A. Oh, he was active, helping the rest of the students to study his medical science.

"Q. But at the so-called meetings once, twice or three times he never said a word, is that right?

"A. No. Unless he was straight asked because it can happen that somebody was asked straight about certain things.

.        .        .        .        .

"Q. Do you know now whether Dr. Berenyi attended open or closed meetings?

"A. I can't recall.

"Q. Did you ever have any discussions with Dr. Berenyi concerning his beliefs in Communism or the principles of Communism?

"A. Oh, sometimes certain things came up, certain questions. He didn't say too much; and if he said something, it wasn't for the favor of the Communists.

.        .        .        .        .

"Q. And as a result of your talk with Kalman Berenyi, could you tell this Court what his feelings were towards Communism?

"A. I don't believe he was a Communist, even if he was a member of the Communist Party. I don't believe he was Communist in heart.

.        .        .        .        .

"Q. Do you assert that he is a member—do you assert that he was a member of the Communist Party?

"A. I thought he was a member of the Communist Party because I have seen him on those certain meetings.

646

"Q.  And that was all you had to base it on?
"A.  That is right."

.            .            .            .            .

And it appears that even at the so-called "closed party
meetings," noncommunists were admitted.  For a "closed
party meeting" was explained by Halasz to mean "that
only the Party members can say anything or vote on any
subject:"

"The Court. But it was possible that non-Commu-
nists—when I say 'noncommunists,' they who were not
members of the Party were present, but if they were
present, they were not allowed to speak and they were
not allowed to vote, is that right?

"The Witness. That is right, yes."