**Petition for Naturalization of Antonio Hector MILLAN.**

**No. 275361.**

United States District Court
C. D. California.
April 13, 1967.

David C. Marcus, Los Angeles, Cal., for petitioner.

Brian H. Simpson, Los Angeles, Cal., for the Government.

## ORDER DENYING PETITION FOR NATURALIZATION

FERGUSON, District Judge.

This matter is before the Court as a final hearing upon a petition for naturalization pursuant to 8 U.S.C.A. § 1447.

The petitioner is a native of the Republic of Mexico who entered the United States in 1949 and has never been admitted for permanent residence.

On March 24, 1964, and April 3, 1964, hearings were held before a special inquiry officer of the Immigration and Naturalization Service in regard to deportation proceedings against petitioner.

An order of deportation was entered against him, and on April 5, 1965, the United States Court of Appeals for the Ninth Circuit affirmed. Millan-Garcia v. Immigration and Naturalization Service, 343 F.2d 825 (9th Cir. 1965).

Thereupon the petitioner petitioned for a writ of certiorari to the United States Supreme Court, which Court, on November 8, 1965, in a per curiam opinion (382 U.S. 69, 86 S.Ct. 247, 15 L.Ed. 2d 144), directed as follows:

"The motion for leave to proceed *in* forma pauperis and the petition for writ of certiorari are granted. The judgment is vacated and the case is remanded to the Court of Appeals upon examination of the entire record and in light of the representations of the Solicitor General that the petitioner will be afforded an opportunity to apply for citizenship and that there will be no deportation proceedings until such determination."

On January 11, 1966, the Court of Appeals for the Ninth Circuit issued its order directing the petitioner be granted an opportunity to file his petition for naturalization with the District Court.

On January 31, 1966, the petitioner filed his petition for naturalization, and on February 17, 1966, and March 14, 1966, a preliminary examination was conducted by an officer of the Immigration and Naturalization Service. Pursuant to 8 U.S.C.A. § 1446(d) a recommendation to deny the petition and the reasons therefor were submitted to the Court.

The Court received into evidence the oral testimony of the petitioner, and that of Glen Michael and Rose Uylhara, who were favorable to the petitioner. The petitioner examined under oath Brian H. Simpson of the Immigration and Naturalization Service, who had conducted the administrative hearings in regard to the naturalization proceedings. In addition, the Court received into evidence (1) the petitioner's military service record; (2) the transcript of the preliminary examinations conducted on February 17, 1966, and March 14, 1966; (3) the transcript of the deportation proceedings held on March 24, 1964, and April 3, 1964; and (4) the application to file a petition for naturalization, dated January 31, 1966.

The only serious challenge of the petitioner to the introduction of evidence was in regard to the transcript of the hearing at the deportation proceedings. He objects to the introduction of the transcript for the reason that at that hearing he was not represented by counsel and the Government failed to appoint counsel to represent him. The objection is fully answered by the Ninth Circuit in

the deportation proceedings and need not be discussed further here. Millan-Garcia v. Immigration and Naturalization Service, 343 F.2d 825 (9th Cir. 1965).

Preliminarily it should be stated that the hearing before the Court was a final hearing in accordance with 8 U.S.C.A. § 1447(b), and the Court has arrived at its judgment independently of any findings and recommendations of the naturalization examiner.

The threshold of the petitioner's difficulties with the Government over his deportation and naturalization concern his involvement with the Fair Play for Cuba Committee, the July 26th Movement, the Socialist Workers Party and the Young Socialist Alliance, and his association or contacts with individuals known or suspected to have Communist Party affiliation. The Government does not develop the involvement and association by independent witnesses, but instead chooses to rely on the testimony of the petitioner given under oath at the various proceedings before the Immigration and Naturalization Service.

The petitioner explained to the Court that he has now changed his political beliefs, and states that he is in favor of the "United States type of government because it is more democratic". He testified that when he learned that Castro was a Communist he "thought very hard about it". His acquaintances were not helpful to him, but in time "I alone changed my mind about Castro during the missile crisis. If he wasn't a Communist, he had gone too far in his ties with Russia."

During the deportation proceedings, petitioner stated that in the event of armed conflict between the United States and any Spanish-speaking country, he would not bear arms against such a country. He now states that he would bear arms without any reservation.

In summary, he states that in 1964 during his deportation proceedings he was in a mixed-up state of mind in regard to his loyalty to the United States; he "didn't know where he stood". He states that now he knows that his loyalty is with this country where he seeks to become a citizen.

The following sworn testimony, in part, was given by petitioner on March 24, 1964, at his deportation proceedings:

"Q Well, let me ask it then, Mr. Millan. Have you ever advocated or furthered the principles of Communism?

A I probably did when I was in FAIR PLAY, but that was unknowingly. The questions here are knowingly.

Q Well, sir, the question isn't exactly that way. Let's read it: 'Do you now, or have you ever, advocated, taught, believed in or knowingly supported or furthered the interests of Communism?'

A No, not knowingly.

Q Let me ask you now: Have you ever advocated the principles of Communism?

A No.

Q Have you ever taught the principles of Communism?

A Yes, I taught the principles of Communism.

Q Then, as I understand this question, sir, you couldn't honestly answer 'no,' because the 'knowingly' portion of it relates to whether you have supported or furthered the interests of Communism.

A Well, the question to one of your answers is 'yes,' to the other is 'no.'

Q All right, then we are clear on the fact that you have taught the principles of Communism?

A Yes.

Q And the other portion is: 'Have you ever believed in the principles of Communism?'

A Yes, I believed in the past in the principles.

Q Very well, sir. You do, however, deny having knowingly supported

or furthered the interests of Communism, is that correct?

A Knowingly, yes.

Q Since you now admit that you have taught and believed in the principles of Communism, are you willing to explain when and where that occurred?

A Where I discussed the principles?

Q No, we'll take it one portion at a time. You have indicated, sir, that you taught the principles of Communism.

A Yes, I taught the—

Q Please explain when and where you taught the principles of Communism?

A I discussed with many people that I met in Fair Play and the July 26th Movement, the Socialist Workers Party, to these meetings that I had gone to and that's what it was discussed, the principles of Socialism or Communism or whatever—

Q Mr. Millan, the question I directed was not whether you had ever discussed these matters, but did you teach the principles of Communism?

A No, I did not teach them. The statement you made was discussed, not taught.

Q I don't believe that's true. I said: have you ever taught the principles of Communism?

A No, I have never taught the principles of Communism. I discussed them, yes.

Q Are you now changing your answer because I believe your answer said that you did teach them?

A No, I did not teach them.

Q Are you now •changing your answer?

A Yes, I am.

Q All right, sir. You indicated earlier that you did believe in the principles of Communism. Can you explain when and where you acquired this belief in Communism?

A Well, not in Communism, in certain principles that I agreed with. I agreed—like, equality, that they say so about the races, no distinction of races; not being—not being prejudiced, in a so-called social society. That's some of the parts that I believed in.

Q Mr. Millan, have you read the writings of Karl Marx?

A No, I haven't.

Q Have you read the writings of Lenin?

A I read some parts of his writings, not—

Q Where did you first come into contact with principles of Communism which you say you believe in?

A Through the Socialist Workers Party I discussed with them the things—these principles.

Q When and where did you first come into contact with the Socialist Workers Party?

A I don't recall the date. The place, the first place was by City College, I was going there at the time and they had an office there and that, I believe, was the first time I started discussing things with them."

The following sworn testimony, in part, was given by the petitioner on March 14, 1966, at the hearing before the naturalization examiner:

"Q Do you now or have you ever in the past believed in the principles of Communism?

A Well, it all depends on what you mean by principles because I believed at the time, of Fidel Castro such as being a just man and presenting a new way of life for the Latin American countries. At that time—now that he's labeled a Communist and I believed at that time in what he stood for I would say that I did believe.

Q Mr. Millan, what are the principles of Communism?

A I don't really know.

Q Well, then what are the principles for which you think Mr. Castro stands that you agree or that you have arrived at or concluded to be the principles of Communism?

MR. MARCUS:

I would like to direct your attention to the interrogation by that Special Inquiry Officer relative to this subject.

DESIGNATED EXAMINER:

Excuse me, Mr. Marcus, let's just finish this first. It is a direct question now. We'll come back to it at a later time, but for the time being, Mr. Millan, can you explain your position with regard to this matter.

PETITIONER:

At that time or the present?

DESIGNATED EXAMINER TO PETITIONER:

Q At that time, let's begin there?

A Okay, at that time I believed— what I thought he—that he stood for.

Q What, would you state it again please?

A I will state again I thought he was a new type of leadership for the Latin American countries to follow.

Q In what respect, can you give me a specific? What type of leadership are you talking about?

A In the respect that he would be more just with the masses and he would not be the usual politician that most Latin American countries have, in that respect.

Q What principles did Mr. Castro advocate that you found particularly attractive?

A At that time he didn't advocate any principles as such, but the way he went about it.

Q You mean by revolution?

A The revolution, yes, I not saying it right.

Q Well, take your time and start again.

A What I'm saying is—by that I mean like when he first started I read all these matters as to how he first started. He was a lawyer but always stood up for the oppressed and so on and I was impressed by these deeds and I thought that he would always be a just man, that he would do something for the oppressed like he was doing before he was put in prison and exiled, and after he came to power he, well, he was very dynamic; he would do things that I thought they were right.

Q And do you consider this the same as the principles of Communism, or representing the principles of Communism, or did you at that time consider this to be the case?

A No, but now at the present time that he is a Communist it would seem that I would follow the same principles, well, that's about all I can say.

\* \* \* \* \* \* \*

Q Insofar as the principles of Communism are concerned you have expressed on a prior occasion that the principles of Communism with which you agreed are equality with regard to the races, no distinction with regard to the races, not being prejudiced in a so-called social society. Do you recall making these statements or holding these views?

A Yes.

Q Well, what did you mean? Would you elaborate a little bit, sir?

A Well, my thought at the present is not the same as it was at that time.

Q Well, what was it then?

A Well, at that time, call it what you may, I did have a feeling that there was prejudice and that I should do something about it. Actually there are prejudice people, but after all that doesn't bother

Q me any more. I mean I have my own prejudice myself so it's only natural.

Q When you use this term then as opposed to now are we talking about 1964 where a deportation proceeding

A No, I'm talking about when I was running around with the Fair Play for Cuba and so on.

Q 1961–1962?

A Yes.

Q Did you, however, still maintain these beliefs in 1964?

A I must explain what I—I believe when I made these expressions we were referring to a time that I was running around when I was with Fair Play for Cuba.

Q Mr. Millan, have you ever been associated or connected in any way with any Nicaraguan organizations?

A Yes, I have.

Q In what respect?

A In the respect that I met this fellow through the Socialist Workers party and (Interrupted by Designated Examiner)—

Q What fellow?

A His name was Hector Hernandez or—I think it was Hector Hernandez I don't recall the last name. He wanted some help in getting supplies, ammunition, arms and so on to supply a rebel band of 100 men in Nicaragua.

Q For the purpose of overthrowing the Government of Nicaragua?

A No, this was for the purpose of conducting gorilla warfare in the country and eventually the overthrowing of the government.

Q When was this?

A In 1962 around that time.

Q Do you recall being asked questions with regard to this Nicaraguan movement before the Special Inquiry Officer?

A Yes, I do.

Q Did you at that time refuse to answer those questions?

A Yes, I did.

Q Why?

MR. MARCUS:

He has a constitutional right to refuse and I don't think he can he's answering the questions now.

DESIGNATED EXAMINER TO PETITIONER:

Q What did you refuse to answer?

A Why, this person had become— at one time there was a member of the group who was traveling to Venezuela and through American agents the plane was forced to land in Nicaragua and the fellow member of the organization was taken off the plane and was never heard from again and I was told that he had been executed and I didn't want to give any information that would endanger the life of anybody.

Q Insofar as this Nicaraguan movement was concerned what part, if any, did you play in the gathering of arms (Interrupted by petitioner).

A We weren't gathering arms at all. We were more or less looking around to see if there were any ways of getting this equipment, arms, support and money and so on, and I helped him in making contacts with people who asked my help, but there was never any help at all.

Q Now, why did you associate yourself with this type of a movement or organization or a person dedicated to this type of movement or organization?

A I don't really know. Maybe I didn't care much about what I did or what I was doing.

Q Well, you previously referred to your interest in Latin American affairs, hemispheric conditions. Did it have anything to do with this?

A Probably.

Q In what respect?

A Well, in the respect that, well, you use so much—there again it depends from where you get your information or the usual material.

Q It very definitely does, but what was your feeling in regard to this?

A My feeling was that in Nicaragua they had this dictator who is doing this and doing that and that this country is the next place where a revolution would take place.

MR. MARCUS:

Do you mean Nicaragua?

PETITIONER:

Nicaragua, yes, that's what we're discussing.

\* \* \* \* \* \*

Q Were you in favor of the overthrow of the Nicaraguan Government at the time you were associated with this group?

A Yes, I was."

\* \* \* \* \* \*

When referring to the Fair Play for Cuba organization the following testimony was given:

"Q How did you join this organization? Did you fill out an application, pay dues?

A No, I just paid a dollar and they didn't even take my name and so on and (sic) they told me I was in the organization.

Q Did you attend meetings of this organization?

A I attended meetings, yes.

Q Did you take part in these meetings?

A Yes, I took part in these meetings.

Q To what extent?

A To the extent of organizing meetings, printing pamphlets."

In response to the question on March 14, 1966—

"Do you believe that Castro was correct in the confiscation of property belonging to American firms in Cuba subsequent to the revolution?"—

petitioner replied that at the time the property was confiscated he was in favor of it.

From the evidence before it, the Court concludes that the petition for naturalization should be denied. The burden upon a petitioner is stated in Berenyi v. Immigration Service, 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656:

"But when an alien seeks to obtain the privileges and benefits of citizenship, the shoe is on the other foot. He is the moving party, affirmatively asking the Government to endow him with all the advantages of citizenship. Because that status, once granted, cannot lightly be taken away, the Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship. For these reasons, it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect. This Court has often stated that doubts 'should be resolved in favor of the United States and against the claimant.' E. g., United States v. MacIntosh, 283 U.S. 605, 626."

8 U.S.C.A. § 1427(a) requires that a petitioner for naturalization must establish that during the five years preceding the filing of his petition he has been a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

Within the five years from the date of his application to become a citizen the petitioner:

1. Endeavored to obtain arms and equipment for the overthrow of a foreign government.

2. Approved the confiscation of private property without due process or payment.

3. Declared he would not bear arms in the event of armed conflict between the United States and any Spanish-speaking country.

4. Was ambivalent in his loyalty to the United States.

5. Stated that he believed in the principles of Communism.

6. Stated that he taught the principles of Communism, although later retracted his testimony.

7. Actively worked for the organization known as Fair Play For Cuba.

The petitioner has not passed the tests for the requirement of naturalization.

It is ordered that the petition for naturalization be denied.

It is further ordered that the Clerk this date shall serve copies of this Order by United States mail upon the attorneys for the parties appearing in this cause.