**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-4733**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HAYDAR BADAWI SADIG,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Richard L. Voorhees, District Judge. (CR-03-62)

Argued: November 2, 2007          Decided: December 27, 2007

Before TRAXLER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Traxler and Judge Shedd concurred.

**ARGUED:** Anthony Glen Scheer, RAWLS, DICKINSON & SCHEER, P.A., Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

A jury found Haydar Badawi Sadig ("Sadig") guilty of knowingly attempting to procure citizenship contrary to law, in violation of 18 U.S.C. § 1425(a). When Sadig originally submitted his application for naturalization, he truthfully indicated that he had not been arrested or charged with violating any laws. After submitting his application, but prior to his pre-naturalization interview, Sadig was arrested on misdemeanor assault charges and felony interference with a flight crew, which he subsequently failed to disclose. During his interview, moreover, he signed a form representing, under penalty of perjury, that the information he had submitted was true and correct. Because we find that the district court did not abuse its discretion in denying Sadig's request to instruct the jury that an applicant for naturalization has no duty to volunteer information at the interview and because we find that the district court did not err in its instruction, we affirm.

I.

Sadig, a Sudan native, was granted permanent asylum in 1993. On August 2, 2000, Sadig applied for citizenship by submitting a completed N-400 form. Question 15(b) on the form asks if the applicant has ever "been arrested, cited, charged, [or] indicted . . .for breaking or violating any law or ordinance[,]" to which

Sadig truthfully answered in the negative. J.A. 241. While returning to the United States from overseas on November 14, 2000, however, Sadig was involved in an altercation with the airline flight crew. Upon arrival, Sadig was arrested and charged with felony interference with a flight crew and three counts of misdemeanor assault. Those charges were still pending at the time of his pre-naturalization interview on August 7, 2001.[1]

At the interview, Sadig reviewed his previously completed N-400 form, which contained a check mark in the "No" box next to question 15(b). The final section of the form instructs the applicant not to complete it until directed to do so at the interview. The paragraph under the instruction reads as follows: "I swear that I know the contents of this application, . . . that the corrections, numbered 1 through 9 were made at my request, and that this amended application, is true to the best of my knowledge and belief." J.A. 242. The form also contains the following statement:

> I certify . . . under penalty of perjury under the laws of the United States of America that this application, and the evidence submitted with it, is all true and correct. I authorize the release of any information from my records . . . to determine eligibility for the benefit I am seeking.

---

[1]Sadig ultimately pleaded guilty to the misdemeanors and was sentenced to a term of two years' probation.

J.A. 242. Sadig signed the form during the interview, and was subsequently granted U.S. citizenship.

In December 2003, Immigration and Customs Enforcement agents learned that Sadig became a citizen following his November 2000 arrest and that there was no reference to that arrest on his application even though the pre-naturalization interview was conducted after the arrest. Sadig was subsequently charged with three crimes alleging violations committed by him at his pre-naturalization interview. Count One charged Sadig with knowingly making a false statement under oath in a matter relating to and under a law of the United States relating to naturalization, citizenship and registry of aliens, in violation of 18 U.S.C. § 1015(a). Count Two charged Sadig with knowingly and willfully making a materially false, fictitious and fraudulent statement and representation, in violation of 18 U.S.C. § 1001(a)(2). Finally, Count Three charged Sadig with knowingly procuring and attempting to procure, contrary to law, the naturalization of a person and other evidence of naturalization and citizenship, in violation of 18 U.S.C. § 1425(a).[2] J.A. 11-12.

Sadig's jury trial commenced on May 20, 2004. At trial, the government presented the testimony of Charles Seagle Cross ("Cross"), a retired Immigration and Naturalization Service ("INS")

---

[2]On May 19, 2004, the district court granted the government's motion to dismiss Counts Four and Five.

agent with 31 years of experience as an immigration examiner.[3] The district court accepted Cross as an expert in immigration and naturalization procedures. Mr. Cross testified that the naturalization process begins with the filing of an application, the N-400 form, after which the applicant appears before an adjudicator for a pre-naturalization interview. According to Mr. Cross, the purpose of the interview is to "give the applicant the chance to establish that they [sic] are entitled to the benefit that they are seeking," noting that the applicant has the burden of establishing his or her entitlement to citizenship. J.A. 43.

Mr. Cross further described the interview process. He testified that the adjudicator places the applicant under oath, asking him to swear or affirm that the contents of the application are correct. The adjudicator routinely asks the applicant every question contained in the application. If a change is required, based on the answers provided by the applicant, the adjudicator notes that change in red ink and numbers the change. While Cross testified that all of the questions on the application are important, he stated that 15(b), which asks whether the applicant

---

[3]As of March 1, 2003, INS ceased to exist as an agency within the Department of Justice. Its functions are now performed by three agencies within the Department of Homeland Security: (1) the Bureau of Immigration and Customs Enforcement, responsible for the enforcement of immigration laws; (2) the Bureau of Citizenship and Immigration Services, responsible for administering services and benefits under the immigration laws; and (3) the Bureau of Customs and Border Protection, responsible for the United States Border Patrol. See 68 Fed. Reg. 10922-01 (Mar. 6, 2003).

has "knowingly committed any crime for which [he has] not been arrested" or has "been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance, excluding traffic regulations," J.A. 241, is the most significant. If the applicant were to report that he had been charged with a crime, the adjudicator would ask about the nature of the criminal conduct with which he was charged. Then, following the interview, the applicant would be required to complete a form related to the criminal behavior and provide the adjudicator with a certified copy of the charging document. According to Cross, an applicant would not be approved for naturalization while the charges were pending. Once the charges were resolved, the adjudicator would make a determination as to whether the conduct was serious enough to justify denying the applicant citizenship.

On cross-examination, when asked whether he was aware of any federal regulation or published manual requiring that every question on the application be asked during an interview, Cross answered that he was not aware of any such written policy, but that it was the standard practice of every adjudicator with whom he worked to ask every question, particularly number 15. Cross also affirmed that every applicant has a duty to answer all question on the N-400 form honestly and truthfully. When asked whether an applicant has a legal duty to volunteer information not asked by the adjudicator during the interview, Cross responded that the law

requires that an applicant remain eligible for naturalization up to the moment he is sworn-in, but acknowledged that there is no written regulation or rule requiring an applicant to voluntarily update his application.

Regina Bryant ("Bryant"), the adjudicator who interviewed Sadig, testified next. Bryant stated that she worked for the agency for 24 years, of which 15 were spent conducting interviews. It was her practice to begin each interview by placing the applicant under oath. After that, she would go through the entire application with the applicant to make sure that all of the information on the application was correct, marking each question asked in red ink. Like Cross, Bryant testified that number 15 was the most important question on the application; when she would reach that question, she would pause briefly so as to emphasize its significance. With respect to the certification under penalty of perjury language at the end of the application, Bryant stated that she would instruct the applicant to read the statement and sign it if he agreed with it; then she would sign the form as well.

Based on what Bryant could tell from Sadig's application, she had in fact asked him all of the questions, including number 15, because each question had a red check mark next to it. According to Bryant, had Sadig changed his answer to question 15 from the "no" that he originally reported to a "yes," she would have made notes next to the question. Further, Bryant noted that Sadig's

application reflected nine changes based on information gathered during the interview and that Sadig had signed the application in her presence. Bryant had signed the form as well.

The government's final witness, Special Agent John Scott Sherrill ("Agent Sherrill"), was an investigator working with the Bureau of Immigration and Customs Enforcement. Agent Sherrill testified that he began investigating Sadig's alleged naturalization fraud in 2003 after learning that Sadig had become a citizen, following his arrest on assault charges, without having mentioned the arrest on his application. When Agent Sherrill questioned Sadig about his failure to report his arrest during his pre-naturalization interview, Sadig responded that while the adjudicator had asked him most of the questions on the application, she had not asked him about criminal charges or convictions.

Similarly, when testifying on his own behalf at trial, Sadig stated that the adjudicator did not ask him every question on the application and that the interview only lasted between ten and fifteen minutes. Sadig specifically stated that the adjudicator did not ask him question 15(b), related to his criminal conduct. Because he had not been asked, he did not volunteer any information, consistent with the legal advice he had received.[4]

_____

[4]Sadig's wife also testified that she and her husband had considered withdrawing their citizenship applications after Sadig's arrest, but decided against it after consulting with their friend, a law professor at Emory Law School in Atlanta, Georgia. They decided that Sadig should testify truthfully if asked about his

Sadig also testified that at the end of his interview, Bryant handed him numerous documents, in addition to the N-400 form, which he signed without reading.  In particular, Sadig testified that he did not read the statement regarding providing truthful evidence under penalty of perjury at the end of the application prior to signing it.

With respect to Count Three, charging him with attempting to procure naturalization contrary to law, Sadig filed proposed jury instructions essentially stating that there is no legal duty for an applicant to volunteer any information during the pre-naturalization interview.  The government opposed the instruction, noting that the form itself requires that an applicant affirm at the conclusion of the interview that everything in the application is correct.  The government argued that the proposed instruction would be misleading and confusing in light of that requirement. The district court declined to give the proffered instruction. Instead, it instructed the jury as to the elements of the offense by tracking the language of the statute.[5]

criminal charges that had arisen since the filing of his application, but that he would not volunteer any information.

[5]The judge instructed the jury that Sadig

could be found guilty of [knowingly procuring citizenship contrary to law] only if each of the following elements of the crime [was] proved beyond a reasonable doubt: First, that the defendant procured or attempted to procure citizenship.  Second, that it was contrary to the law to procure such citizenship.  And third, that he knew

During closing arguments, the government disputed Sadig's contention that an applicant has no duty to volunteer information during a pre-naturalization interview by stating "[t]hat is not the law and that is not accurate." J.A. 551. The government explained to the jury that the purpose of the "under penalty of perjury" language was to compel an applicant to inform INS if information contained in the application was inaccurate. See J.A. 242.

The jury acquitted Sadig of Counts One and Two involving knowingly making false statements, but convicted him of Count Three. Sadig now appeals, arguing that because the district court refused to give his proposed jury instructions as to Count Three, the jury received improper instruction as to the law.

## II.

We first turn to the issue of whether the district court abused its discretion by not giving Sadig's proposed jury instruction. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992) (a district court's "decision to give (or not to give) a jury instruction . . . [is] reviewed for abuse of discretion."). A "district court should give the instruction that a criminal defendant requests as to any defense as long as the instruction: 1) has an evidentiary foundation; and 2) accurately states the law

---

it was contrary to the law to procure such citizenship. J.A. 571-72.

applicable to the charged offense." United States v. Stotts, 113 F.3d 493, 496 (4th Cir. 1997). Even if these factors are satisfied, failure to give the defendant's instruction is not reversible error unless a defendant can show that the record as a whole demonstrates prejudice. See United States v. Ellis, 121 F.3d 908,923 (4th Cir. 1997).

Sadig contends that the district court abused its discretion by refusing to give his proposed instruction that "[t]he law does not require that someone being interviewed volunteer information to the INS." J.A. 455. This argument is a red herring. While Sadig is technically correct that no legal requirement compels an applicant to volunteer information during an interview, the law does require an applicant to remain eligible for naturalization up until the date he is administered the oath of allegiance. Further, the burden is on the applicant to prove such eligibility. Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637 (1967); 8 C.F.R. § 316.2 (b) ("The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization[.]"); 8 C.F.R. § 316.10(a)(1) ("An applicant for naturalization bears the burden of demonstrating that . . . he or she has been and continues to be a person of good moral character. This includes the period between the examination and the administration of the oath of allegiance.").

Moreover, the N-400 form and the interview are the process through which an applicant proves eligibility. The form itself requires that all information be true as of the date of the interview and obligates the applicant to sign an oath to that effect. The applicant imposes a requirement on himself to be forthcoming by swearing "under penalty of perjury" that the information in the application is true as of the date of the interview. See J.A. 242. Even if the applicant does not have a generalized duty to volunteer information, the oath at the end of the application specifically and absolutely requires that the answers be true and correct. Read together, the form and regulations required Sadig to respond in any manner necessary, including volunteering information, to ensure that the statements in the N-400 were accurate.

A jury instruction that the applicant does not have a duty to volunteer information would fly in the face of the affirmative obligation to prove his eligibility by answering the questions on the N-400 form truthfully, and would be at best misleading and at worst an inaccurate statement of the law. The district court did not abuse its discretion in refusing to give such an instruction, and it was well within the province of the jury to decide that Sadig's failure to disclose the charges against him constituted the knowing procurement of citizenship contrary to law.

Even if Sadig could have shown that the court abused its discretion, he did not demonstrate that the failure to give his requested instruction, in light of the record as a whole, was prejudicial error. See Ellis, 121 F.3d at 923.. To find such an error, we would have to conclude that the evidence was insufficient to support a finding that by failing to disclose the charges, Sadig knowingly procured citizenship contrary to law. Cf United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996). For the reasons stated above, we cannot reach such a conclusion.

Although Sadig specifically challenged the failure to give his proffered jury instruction and acknowledged at oral argument that if we disagree we can properly affirm the district court, out of an abundance of caution we will briefly address the question of whether the court's instruction as to Count Three fairly stated the controlling law.

III.

We review de novo the legal question of whether a court has properly instructed the jury on the elements of an offense. United States v. Rahman, 83 F.3d 89, 92 (4th Cir. 1996). With respect to the adequacy of the instructions, this court "accord[s] the district court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." Teague v. Bakker, 35 F.3d 978, 985 (4th Cir.

1994); see also United States v. Cobb, 905 F.2d 784, 788-89 (4th Cir. 1990).

Section 1425(a) criminalizes the conduct of any person who "knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship." 18 U.S.C. § 1425(a). As noted above, the district court instructed the jury that they could only convict Sadig of this offense if they found (1) that Sadig procured or attempted to procure citizenship, (2) that it was contrary to the law to procure such citizenship, and (3) that Sadig knew it was contrary to the law to procure such citizenship.

Sadig admits, as indeed he must, that the district court's instruction accurately tracked the language of the statute. Nonetheless, for reasons that parallel those in support of his proffered instructions, Sadig maintains that the jury instruction did not fairly and adequately state controlling law. According to Sadig, Cross's testimony and the government's closing argument left the jury with an improper understanding of the law: that there was a "legal requirement imposed on citizenship applicants to voluntarily update their application when there is a change as to one of the questions asked when they originally apply." Appellant's Br. at 13. Therefore, Sadig contends that Cross and the government misstated the law and the court erred in not clarifying their misstatements in the jury instructions.

This argument must also fail. Cross's testimony and the government's closing arguments were not misstatements of the law, rather they were accurate reflections of the requirements of the N-400 form. Cross only testified within the scope of his expertise as to INS procedures and the requirements of its application. He acknowledged that nothing in the regulations or the adjudicator's field manual states that an applicant has a duty to voluntarily update his application and then simply reiterated the affirmative obligations imposed by the form and the regulations. To the extent that Cross testified as to what the law is, it is not a misstatement that an applicant must remain eligible up until the time he takes his oath. See Berenyi, 385 U.S. at 637. As we have already explained, any instruction to the contrary would simply be incorrect. Similarly, the government's closing argument merely enforced what was in fact a correct statement as to the requirements of the application that the information therein be true and correct under penalty of perjury. Therefore we must disagree with Sadig's contention that the testimony left the jury with an incorrect understanding of the law that the district court needed to clarify.

IV.

Because we find that the court did not abuse its discretion in denying to give Sadig's proposed jury instruction, and because we

-15-

further find that the district court did not err in its instruction, the judgment of the district court is

<u>AFFIRMED</u>.
