**In the Matter of VERRAZZANO TOWERS, INC., a New York Corporation, Debtor.**

**Bankruptcy No. 180–02375–16.**

United States Bankruptcy Court, E. D. New York.

March 31, 1981.

Jessel Rothman, P. C., Mineola, N. Y., for Flushing Savings Bank, for the motion; Jessel Rothman, Mineola, N. Y., of counsel.

Franklin Rand Weiss, P. C., Corona, N. Y., for debtor, in opposition; Franklin Rand Weiss, Corona, N. Y., and Leon Rock, Corona, N. Y., of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is a motion, brought by way of order to show cause by the Flushing Savings Bank ("FLUSHING") on May 13, 1980, to dismiss the petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978 ("THE CODE"), 11 U.S.C. Section 101 *et seq.* filed by Verrazzano Towers, Inc. ("THE DEBTOR") on May 6, 1980, on the ground that "the filing of the petition was not authorized by the corporation . . . ." (Order to Show Cause signed on May 14, 1980). The sole asset of the debtor is a large, mostly undeveloped parcel of real estate located at 9975 Shore Road, Brooklyn, New York ("THE PROPERTY").

James C. Gherardi ("GHERARDI"), the individual who executed the Chapter 11 petition as the alleged president of the debtor, submitted an affidavit dated May 16, 1980, and counsel for the debtor submitted a memorandum of law also dated May 16, 1980 in opposition to the motion. Both documents argue, *inter alia,* that Flushing, as a secured creditor, has no "standing to raise the issue as to the authorization of the filing of the petition by the corporation . . . ." ("MEMORANDUM OF LAW SUBMITTED ON BEHALF OF THE DEBTOR, VERRAZZANO TOWERS, INC., IN OPPOSITION TO THE MOTION BY THE FLUSHING SAVINGS BANK, A SECURED CREDITOR OF THE BANKRUPT CORPORATION, TO VACATE THE VOLUNTARY PETITION IN BANKRUPTCY,"

dated May 16, 1980.) After a brief hearing on May 19, 1980 and submission of a memorandum of law by Flushing, for the motion, and a reply memorandum by the debtor, on May 23, 1980, I heard oral argument on the issue of Flushing's standing to question the propriety of the filing of the petition.

The debtor, at page 3 of its memorandum of law dated May 16, 1980, argued, *inter alia,* that Flushing's motion:

"specifically states that the petition should be vacated 'on the grounds that the filing of the petition was not authorized by the corporation.' There is no claim being made by the Bank as to the lack of jurisdiction of the Bankruptcy Court or that a fraud has been perpetrated on the Bankruptcy Court."

It cites cases which question the standing of creditors to challenge the filing of a petition on the ground that the board of directors lacked authority to file a voluntary petition, or to consent to the filing of an involuntary petition. *See e. g. In re Guanacevi Tunnel Co.,* 201 F. 316, 318 (2d Cir. 1912); *In re E. T. Russell Co.,* 291 F. 809, 818 (D.Mass.1923); *In re United Grocery Co.,* 239 F. 1016, 1018 (S.D.Fla.1917).

Flushing, in its memorandum of law dated May 21, 1980 and at the hearing of the motion (Trial Transcript ["TR."], May 23, 1980, p. 6, l. 8—p. 8, l. 4), argued that the motion went beyond the mere allegation that the board of directors of the debtor did not authorize the filing of the petition; that it raised the issues of fraud and lack of jurisdiction by alleging, *inter alia,* that Gherardi was not the president of the debtor, that he secretly transferred the property from an entity known as RGR Associates ("RGR") to the debtor in order to file the petition, and that he secretly filed the petition without consulting or informing the other directors and stockholders of the debtor. (Affidavit of Jessel Rothman, Esq. dated May 13, 1980, in support of Flushing's Order to Show Cause). In support of this position, Flushing's memorandum of law cites such cases as *Securities and Exchange Commission v. United States Realty & Improvement Co.,* 310 U.S. 434, 457–58, 60

S.Ct. 1044, 1054, 84 L.Ed. 1293 (1940); *In re Ettinger,* 76 F.2d 741, 742 (2d Cir. 1935); *Cornwall Press, Inc. v. Ray Long & Richard R. Smith, Inc.,* 75 F.2d 276, 277 (2d Cir. 1935); *Chicago Bank of Commerce v. Carter,* 61 F.2d 986, 989 (8th Cir. 1932).

At the May 23, 1980 hearing, I rendered the following decision on the record:

"I am going to examine into the execution of the petition in Chapter XI (*sic*), since it contends ['contends' should be 'contains'] a secretary (*sic*) or an officer's certificate signed by Mr. Gherardi, which states as follows, [I shall reprint the original certificate rather than its transcription contained in the record].

'MINUTES of Special Meeting of the directors of VERRAZZANO TOWERS, INC. held on the 5th day of May, 1980 at 10:00 in the forenoon of that day at the offices of the Corporation.

The Chairman announced that a quorum was present and that the meeting had been called for the purpose of considering the filing of a petition in Chapter XI of the Bankruptcy Act. After due discussion and on motion duly made and duly adopted in accordance with the By-Laws of the Corporation, it was

RESOLVED, that the Corporation file a Petition under Chapter XI of the Bankruptcy Act and that the officers and directors of the Corporation and their designated agents be authorized to execute all documents and take all steps to file and effectuate said petition in Chapter XI of the Bankruptcy Act and take all other steps necessary and desirable to carry out the intent and purpose of this resolution.

There being no further business, the meeting was duly adjourned.

Dated: May 5, 1980

(signed) James C. Gherardi
President-Secretary' "

"It is the contention here that Mr. Gherardi was neither the president nor the secretary, that no meeting took place, that there was no authority for the filing of the petition. . . .

\* \* \* \* \* \*

"What I am gong to do is I am going to take testimony on the execution of the petition on the ground that what has not [the word 'not' should be deleted] been raised is a jurisdictional attack on the . . . authority of that particular individual to file the petition, on the ground that he had no standing whatever or no authority whatever to file." [bracketed material added]

(Tr. May 23, 1980, p. 9, l. 12—p. 10, l. 16; p. 12, l. 20—p. 13, l. 4.)

I now take the opportunity to state my adherence to that decision, and to amplify it. To reiterate, the debtor's argument that Flushing, as a creditor, has no standing to contest the filing of its Chapter 11 petition, seeks to limit Flushing's contention to the narrow ground that the petition was not authorized by the corporation. It insists that no claim is raised pertaining to fraud, or lack of jurisdiction in this court. Let us examine this contention.

In the case *In re Guanacevi Tunnel Co.,* 201 F. 316 (2d Cir. 1912), the only case cited by the debtor decided in this circuit, a judgment creditor of a voluntary bankrupt corporation sought to vacate the adjudication in bankruptcy on a number of grounds. It was undisputed that an individual named Meloy, alleged in the petition to be a director of and the president of the bankrupt, filed the petition *with the authority of the board of directors.* With respect to the judgment creditor's contentions that the corporation was solvent and that, under Arizona law, only a majority of the stockholders can dissolve a corporation, the court stated, at page 318: "We will examine this contention, although we think it is one which a creditor has no standing to make in the case of a voluntary petition." With regard to the judgment creditor's allegation that Meloy was not the president or a director of the bankrupt at the time the board authorized him to file the petition, the court stated, at page 319: "We will consider this, assuming that a creditor has standing to make the objection." With regard to the judgment creditor's contention

that the Southern District of New York was without jurisdiction to entertain the petition because the bankrupt had not maintained its principal place of business in New York for the greater part of six months before the filing of the petition, the court stated, at page 319: "This objection, being jurisdictional, may be made by a creditor."

 It is clear from the above that whether or not a creditor has standing to contest the filing of a voluntary petition depends upon the nature of his allegation[s]. Those, for example, centering on the board of directors' power or authority, as provided in state law or in the corporation's by-laws, may not be raised by a creditor. Those questioning the jurisdiction of the court may be raised by a creditor. Other cases, which I shall discuss below, reveal that allegations of fraud also fit into this category. With respect to the allegations that Meloy was not the president or a director, the *Guanacevi* court is not clear on the question of the creditor's standing, choosing instead to assume such standing and to proceed to inquire into the substance of the allegation. It must be borne in mind, however, that, in *Guanacevi*, unlike the instant case, there was no question but that the board met and authorized the filing of the petition. The court nevertheless, made inquiry into the substance of all of the judgment creditor's allegations, even those which the court held him to be without standing to raise. This indicates to me that the courts in this circuit should generally be loath to dismiss challenges to voluntary petitions by creditors without making any inquiry into their substance.

On the other hand, however, allegations which question the jurisdiction of the court, or fraud upon it, may be raised by a creditor. In the case of *In re Ettinger*, 76 F.2d 741 (2d Cir. 1935), a creditor sought vacation of a voluntary petition on the ground that the bankrupt in his petition, "*falsely stated* therein that he had a principal place of business within the Southern District of New YOrk." (*Id.* at 742) (emphasis mine). The court, in granting the creditor's motion

to vacate the adjudication, stated, at page 742:

"Even after an adjudication in bankruptcy, upon a voluntary petition, and even after creditors prove their claims, *if a creditor learns for the first time* that a bankrupt had not established a bona fide residence or domicile within the jurisdiction, and moves to vacate an adjudication for lack of jurisdiction, the motion may be granted. *Also, it is the duty of the court, sua sponte, when it believes its jurisdiction may have been imposed upon, to inquire into the facts and act in accordance therewith. In re Laubheim Bros., Inc.*, 22 F.(2d) 910 (C.C.A. 2); *In re Garneau*, 127 F. 677 (C.C.A. 7). *So a motion to vacate an adjudication may be made by an interested party and granted by the court where the absence of jurisdictional requirements is found subsequent to the adjudication. Chicago Bank of Commerce v. Carter*, 61 F.(2d) 986 (C.C.A. 8); *In re American Bond & Mortg. Co.*, 61 F.(2d) 875 (C.C.A. 7) (emphasis added)."

It is thus clear that upon an allegation by a creditor that the court has been the victim of a false jurisdictional statement, it may inquire into the substance of that allegation. *See also Cornwall Press, Inc. v. Ray Long & Richard R. Smith*, 75 F.2d 276 (2d Cir. 1935).

In *Chicago Bank of Commerce v. Carter*, 61 F.2d 986 (8th Cir. 1932), creditors sought to vacate the bankrupts' voluntary petitions on two grounds: 1) That none of them had maintained their principal places of business within the district for the greater part of the six months next preceding the adjudication, and 2) because "the officers filing the petitions had not been authorized by the board of directors, at a proper and lawful meeting, to file such petitions." (*Id.* at 987.) The court's holding on the issue of standing, which I quoted in my decision rendered from the bench (Tr. May 23, 1980, p. 16, ll. 4–21), was as follows:

"'At the threshold of this controversy, we are met with the objection that the appellants, being creditors, could not

maintain petitions to vacate the adjudication in bankruptcy on a voluntary petition. As a general rule, a general creditor has no such standing in a bankruptcy court as to entitle him to move to vacate an adjudication made in a voluntary proceeding. [citations omitted] In the instant case, however, the motions challenged the jurisdiction of the court, and any interested party may raise the question of jurisdiction, or the court on its own volition may determine the question. We think it fairly well established, both on authority and principle, that a creditor may attack even an adjudication in a voluntary proceeding on the ground of either jurisdiction or fraud upon the court.' "

(*Id.* at 989.)

In the case *SEC v. United States Realty and Improvement Co.*, 310 U.S. 434, 457–58, 60 S.Ct. 1044, 1054, 84 L.Ed. 1293 (1940), also cited by me in my oral decision (Tr. May 23, 1980, p. 12, ll. 2–14), the Supreme Court made the following statement:

"And it has long been the practice of bankruptcy courts to permit creditors or others not entitled to file pleadings or otherwise contest the allegations of a petition, to move for the vacation of an adjudication or the dismissal of a petition on grounds, whether strictly jurisdictional or not, that the proceeding ought not to be allowed to proceed."

A footnote to this statement cites to *Royal Indemnity Co. v. American Bond and Mortgage Co.*, 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100 (1933), a case which may have cast doubt on this aspect of today's decision were it not for the above statement in *SEC v. United States Realty, supra.*

■ It is thus abundantly clear that, when faced with allegations by a creditor of lack of jurisdiction, or fraud, the court may inquire into the bona fides of a voluntary petition seeking relief under the bankruptcy laws, and that courts, at least in this circuit, should be loath to dismiss any such attacks by creditors without hearing their substance, unless thoroughly convinced that the attack is based solely upon grounds such

as the failure of a board of directors to comply with its own certificate of incorporation, by-laws, or with procedural requirements of state law.

■ Flushing, in the affidavit executed by its attorney, which accompanies its order to show cause, alleges that two of the three directors did not authorize the debtor's petition (Affidavit of Jessel Rothman, Esq. dated May 13, 1980, p. 3), that no meeting of the board of directors authorizing this petition was ever held (*Id.*), that Gherardi is not the president of the debtor (*Id.*), and that the petition was never authorized by its stockholders (*Id.* at page 4). Furthermore, although the president-secretary's certificate executed by Gherardi (Flushing's Exhibit 14), and quoted above, was not referred to in the Order to Show Cause or in the Rothman Affidavit accompanying it, it formed an important part of Flushing's argument at the May 23, 1980 hearing (Tr. September 23, 1980, p. 6, ll. 8–23). Flushing alleges that Gherardi therein falsely stated that a meeting of the board of directors of the debtor was held on May 5, 1980 at which it was resolved that a petition for relief under Chapter 11 be filed, and that he was the president of the debtor. Flushing has thus alleged that there had been no determination on the part of the debtor to file this petition, and that Gherardi, in order to induce this court to entertain the petition, despite the lack of any such determination, made a series of false statements. Clearly, these allegations fall within the category which may be raised by a creditor. In accordance with my decision of May 23, 1980, herein reaffirmed, a hearing ensued on the matters raised by Flushing. The following facts were adduced:

In the latter half of 1973, Vincent Riso ("RISO"), his brother Raymond ("RAYMOND") (collectively "THE RISOS") and Gherardi decided to purchase the property at Shore Road in Brooklyn. Toward this end they executed and filed a "Business Certificate for Partners" in the name of RGR Associates on September 6, 1973 (Flushing's Exhibit 10).

Flushing's Exhibit 6 is a memorandum dated September 7, 1973 signed by Riso and Gherardi in which it is noted that they "have contracted to purchase a parcel of land located at Shore Road between 3rd and 4th Avenues, Brooklyn, N. Y., from Harold Pearlman and Irving Rubin, contract vendees." It appears from the record that Messrs. Rubin and Pearlman had previously contracted to purchase the property from the Roman Catholic Diocese of Brooklyn ("THE DIOCESE"), but, before closing, decided instead to assign their contract rights to the Risos and Gherardi (Flushing's Exhibit 6, Debtor's Exhibit X). Before the closing, and upon the advice of counsel, it was decided among the partners of RGR to form the debtor corporation which would purchase the property and immediately deed it to RGR, which would hold it during the planned construction of rental units. Upon the completion of construction, title would be returned to the debtor (Tr. September 8, 1980, p. 33, l. 21—p. 40, l. 13; Tr. September 22, 1980, p. 40, l. 5—p. 45, l. 4). Gherardi owned half of the stock of the debtor, and the other half was divided equally between the Risos. The three stockholders also constituted the Board of Directors (Tr. May 23, 1980, p. 29, ll. 5–17; Tr. September 22, 1980, p. 51, l. 24—p. 52, l. 4) and are the officers. A dispute exists as to whether Riso or Gherardi is the president.

The closing took place on April 17, 1974. The Diocese deeded the property directly to the debtor for $1,450,000 (Debtor's Exhibit A) and took back a first mortgage in the amount of $1,050,000 (Debtor's Exhibit B). The debtor also executed a second mortgage in favor of Irving Rubin and Harold Pearlman in the amount of $275,000 (Debtor's Exhibit C) in consideration of the acquisition of their right to purchase the property from the Diocese. It then deeded the property to RGR (Debtor's Exhibit D). All these transactions occurred on April 17, 1974.

During the period of time from approximately September, 1973 through the consummation of these transactions, Gherardi occupied space in the Risos' office on Bell Boulevard in Queens and met with Riso on an almost daily basis to discuss matters concerning the purchase and development of the property (Tr. September 22, 1980, p. 50, l. 4—p. 51, l. 19; p. 55, ll. 10–19; p. 62, ll. 19–23; p. 66, ll. 18–21). It would appear that this situation continued at least through late July 1974 when Riso was authorized to open a corporate bank account on behalf of the debtor at the National Bank of North America (Debtor's Exhibit W; Tr. September 8, 1980, p. 20, l. 18—p. 22, l. 6; Tr. September 22, 1980, p. 56, l. 24—57, l. 7).

RGR was, however, unable to finance the development of the property and soon found itself in default on its mortgage obligations (Tr. September 5, 1980, p. 15, l. 20—p. 16, l. 12; Tr. September 10, 1980, p. 30, ll. 2–9; Debtor's post-trial memorandum of law, dated November 17, 1980, p. 1). Differences arose among the partners and the Risos commenced an action against Gherardi in the New York State Supreme Court, Queens County. In their complaint, dated October 21, 1975, they sought to recover, *inter alia* $185,742.50 alleged to be monies advanced to RGR by the Risos on Gherardi's behalf and at his request (Flushing's Exhibit 8). Gherardi denied the substance of this allegation in an answer dated February 18, 1976 (Flushing's Exhibit 9).

It would appear that by the time this action was started, Riso and Gherardi were no longer meeting regularly and Gherardi no longer occupied space in the Risos' Bell Boulevard office (Tr. September 22, 1980, p. 71, ll. 7–21).

On December 23, 1976, the Diocese assigned its first mortgage to Flushing for $700,000 (Debtor's Exhibit F). On February 23, 1977, Irving Rubin and Harold Pearlman assigned their second mortgage to Flushing for $275,000 (Debtor's Exhibit J). At the time of these acquisitions by Flushing, RGR was in default on its payments pursuant to both mortgages, and had been so since some time before the commencement of the Risos' lawsuit against Gherardi (Tr. September 10, 1980, p. 30, ll.

2–9; Debtor's post-trial memorandum of law, dated November 17, 1980). On March 25, 1977, the bank commenced a foreclosure action against the property (Tr. September 5, 1980, p. 55, l. 9).

On December 13, 1977, the Risos' lawsuit against Gherardi was settled by a stipulation entered into on the record before the late Justice Frederick E. Hammer, of the Supreme Court of the State of New York, Queens County (Flushing's Exhibit 3). The stipulation provided that Gherardi was to pay to the Risos $82,000 on or before July 1, 1978. If the payment was not made, and such default continued for ten days, the Risos, upon five days notice, could enter judgment for $182,500—the amount sought in the complaint. The parties also agreed to execute a deed to the property which would be held in escrow by Gherardi's then attorneys, Cadwalder, Wickersham and Taft, Esqs., who in turn agreed "to turn same over immediately to either the attorney for the plaintiff or directly to the bank within 24 hours after demand is made upon it." (Flushing's Exhibit 3, p. 4). Edwin David Robertson, Esq., an associate of that firm, represented Gherardi and was the attorney in charge of the case. The parties further agreed to execute general releases and, upon the payment of the $82,000 by Gherardi to the Risos, to exchange the releases and dissolve the partnership. The stipulation also contains the following statement:

> "Any monies received by the plaintiffs from the bank on account of the transfer of said deed shall be applied against any sum in excess of eighty-two thousand dollars to the credit of the defendant.... [A]ny proceeds received by the plaintiffs from mortgagee bank upon tender of the deed in lieu of foreclosure shall be divided equally between the plaintiff and the defendant."

(Flushing's Exhibit 3, p. 3). This provision contemplates that negotiations would be entered into between Riso and Flushing with a view to arriving at an agreement whereby Flushing would pay cash consideration to RGR and discontinue its foreclosure action in exchange for a deed to the property.

Pursuant to the stipulation, the Risos executed a deed in favor of Flushing and delivered it to Robertson, who caused Gherardi to execute it and who continues to hold it in escrow (Tr. September 22, 1980, p. 187, l. 22—p. 189, l. 22; Flushing's Exhibit 12, ¶ 11).

On June 28, 1978, Robertson, on Gherardi's behalf, delivered $82,000 to an attorney representing the Risos, and the attorneys exchanged their clients' respective general releases, all in accordance with the settlement stipulation of December 13, 1977 (Tr. October 10, 1980, morning session, p. 42, l. 10—p. 44, l. 19; Flushing's Exhibit 12, ¶ 15).

Riso's negotiations with Flushing concerning RGR's delivery of a deed in lieu of foreclosure for a cash consideration culminated in two proposed agreements, one dated June 11, 1978 (Debtor's Exhibit N) and another dated July 11, 1978 (Flushing's Exhibit 4). Flushing contends that both agreements were drawn up on July 11 and that the reference to "June" in one of them is an error (Tr. September 8, 1980, p. 69, l. 19—p. 71, l. 12). The debtor contends that both dates on the agreements are accurate. The proposed agreement between RGR and Flushing (Flushing's Exhibit 4) provides that it will pay $100,000 to RGR and that it will discontinue its foreclosure action in exchange for a deed to the property and general releases from RGR, the Risos, and Gherardi in its favor. The proposed agreement further provides that "[t]he parties hereto agree to execute such additional documents, instruments and agreements as may be necessary in order to consummate the transactions contemplated by this Agreement." It is signed by a representative of Flushing and by Riso, on behalf of RGR.

Debtor's Exhibit N is a proposed agreement between Flushing and Riso. It provides that "WHEREAS the BANK and RGR ASSOCIATES ... have entered into a separate agreement this day pursuant to which the BANK has agreed to pay to RGR ASSOCIATES the sum of One Hundred Thousand 00/100 ($100,000.00) Dollars to

discontinue the foreclosure action upon receipt of a quit-claim deed in respect of the Premises ...", Flushing engages Riso to negotiate settlements with all creditors of RGR, and agrees to make available up to $150,000 to pay such settled claims. Riso agrees to bear the expenses necessary to effectuate such settlement unless he settles with the creditors for less than $150,000, in which case the difference shall be applied to his expenses. Riso and a representative of Flushing signed this agreement.

On July 16, 1978, Riso's attorney sent Robertson a copy of Flushing's Exhibit 4, the agreement between Flushing and RGR whereby the latter would receive $100,000 upon delivery of a deed in favor of Flushing. Riso's attorney also requested, pursuant to the agreement, a release by Gherardi in favor of Flushing (letter of Nathaniel Rothstein, Esq. ("ROTHSTEIN"), dated July 16, 1978, appended as an exhibit to Flushing's Exhibit 12).

Robertson responded by letter dated August 4, 1978, wherein he declined to comply with Rothstein's request. His primary reasons are revealed in the following passages:

"In paragraph 4 of the 'Settlement Agreement' with the Bank, R.G.R. Associates has evidently agreed to execute additional documents, instruments and *agreements.* Can you let me know that 'agreements' R.G.R. has obligated itself to execute in connection with this matter.

"Also, I do not by what authority Mr. Riso executed the settlement agreement, without any prior consultation with Mr. Gherardi. The lack of such consultation understandably creates the impression that there is a lack of that degree of full disclosure to which partners have a right."

(Robertson's letter dated August 4, 1978, appended as an exhibit to Flushing's Exhibit 12) (Emphasis in original). Gherardi signed neither of the two proposed agreements between RGR and Flushing, and neither was ever carried out.

By notice of motion dated August 18, 1978, Rothstein sought to compel delivery of the deed which Robertson was holding in escrow. In the accompanying affirmation, Rothstein alleges that he sent Robertson the agreement between Riso and Flushing concerning settlement with RGR's creditors on July 21, 1978 (Affirmation of Rothstein, dated August 18, 1978, appended as an exhibit to Flushing's Exhibit 12).

Justice Hammer decided the August 18 motion on September 13, 1978 by signing the following order:

"All parties are directed to fully comply with the terms of the stipulation of settlement dated December 13, 1977, within 7 days after service of a copy of this order. (Attention is called to pages 6 and 7 of said stipulation wherein the parties agree to comply with the terms thereof.)"

(Flushing's Exhibit 13). Rothstein served this order upon Robertson on September 18, 1978 together with a request for the deed, a certificate of dissolution of RGR, and an executed release by Gherardi in favor of Flushing (Affidavit of Rothstein, attached to Flushing's Exhibit 11).

On September 25, 1978, Robertson wrote to the bank advising it that certain of Gherardi's contentions must be resolved before he would deliver the deed with a release in favor of the bank, to wit, that Riso should immediately return the $82,000 paid by Gherardi pursuant to the stipulation of December 13, 1977, and that half of all monies made available by Flushing, including funds earmarked for the creditors of RGR, should go to Gherardi (exhibit attached to Flushing's Exhibit 11).

On September 26, 1978, Riso's attorney again moved, in Supreme Court, Queens County, for an order directing Gherardi and Robertson to turn over, *inter alia,* the escrowed deed and an executed certificate of dissolution of partnership (Flushing's Exhibit 11). Robertson responded with an answering affirmation dated October 10, 1978 (Flushing's Exhibit 12). Justice Hammer issued a decision on October 16, 1978 which directed Gherardi to deliver the escrowed deed to Riso's attorney and which further directed "the execution and delivery of a certificate of dissolution of the partnership

in form proper for recording, as provided by the terms of the stipulation." The decision specifically refrained from directing the partnership to release the bank, since this was not provided for in the stipulation (Flushing's Exhibit 7). This decision was incorporated in an Order dated October 31, 1978 (Flushing's Exhibit 7). Gherardi filed a notice of appeal (Flushing's Exhibit 17) from Justice Hammer's Order on December 19, 1978, but never perfected it.

In late 1979, the bank was granted summary judgment in its action to foreclose its second mortgage on the property (Tr. October 10, 1980, morning session, p. 64, ll. 22–24). On March 21, 1980, Gherardi arranged to meet with the Risos at their office on Bell Boulevard. Gherardi, in light of the imminent foreclosure on the property by Flushing, proposed the filing of a Chapter 11 petition. Whether the Risos consented to this proposal is a matter of dispute (Tr. September 8, 1980, p. 43, l. 4—p. 46, l. 13; Tr. September 22, 1980, p. 70, l. 22—p. 76, l. 12).

Pursuant to that judgment, a foreclosure sale was scheduled for April 9, 1980 (Debtor's post-trial memorandum of law, dated November 17, 1980, p. 2; Tr. September 22, 1980, p. 77, ll. 8–10). On April 7, 1980, Gherardi executed a deed transferring the property from RGR back to the debtor (Flushing's Exhibit 2) and executed a petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978 ("THE CODE"), 11 U.S.C. § 101 et seq. Due to procedural difficulties, the foreclosure sale was postponed until May 7, 1980 (Debtor's post-trial memorandum of law, dated November 17, 1980, p. 2). On May 5, 1980, Gherardi recorded the deed executed on April 7, 1980, and filed the petition for relief executed on April 7, 1980 in this court. Robertson's law firm did not represent Gherardi in the preparation of these documents. Instead, he retained the law firm of Franklin Rand Weiss, P. C. ("WEISS") for this purpose. On May 14, 1980, Flushing filed its Order to Show Cause commencing these proceedings.

Flushing contends that the petition for relief should be dismissed because the jurisdiction of the court has been fraudulently invoked. In support of its position, it argues that although Gherardi executed the petition for relief as president of the debtor, he never held that office; that the meeting of the board of directors of the debtor, discussed in the president-secretary's certificate signed by Gherardi (Bank's Exhibit 14) and attached to the petition for relief never took place, nor was there any action by the board authorizing the filing of this petition; that the transfer of the property from RGR to the debtor and the filing of the petition were unilaterally carried out by Gherardi without the knowledge or consent of the Risos and that Gherardi had no transferable interest in the property at the time he deeded the property from RGR to the debtor, since he had previously deeded out his interest in the property by executing the deed in favor of Flushing which was being held in escrow by Robertson's firm.

Gherardi, on behalf of the debtor, contends that an informal meeting of the board of directors occurred on March 21, 1980 at which the Risos consented to the filing of the petition. He further contends that their consent was not needed because they had interests which conflicted with their duty as directors by reason of certain other transactions which they had, as joint venturers, with Flushing and due to certain prior negotiations between Riso and Flushing concerning the debtor's property. It argues that the Risos were thus disqualified, under New York law, from participating in the decision to file the petition.

As a threshold consideration, it appears that Flushing is correct in its contention that the president-secretary's certificate signed by Gherardi, reprinted above and included in the petition for relief, contains false statements. In that certificate, dated May 5, 1980, Gherardi states that a "Special Meeting of the directors of VERRAZZANO TOWERS, INC." was "held on the 5th day of May, 1980 at 10:00 in the forenoon of that day at the offices of the Corporation." The certificate further states that:

"[t]he Chairman announced that a quorum was present and that the meeting had been called for the purpose of considering the filing of a petition in Chapter XI (*sic*) of the Bankruptcy Act. After due discussion and on motion duly made and duly adopted in accordance with the By-Laws of the Corporation, it was

RESOLVED, that the Corporation file a petition under Chapter XI (*sic*). . . ." (Flushing's Exhibit 14). Gherardi signed this document as "President-Secretary."

Upon direct examination, Gherardi testified as follows concerning the certificate:

"Q Mr. Gherardi, was there a notice of a board of directors meeting?

"A No.

"Q Considering the bankruptcy?

"A No.

"Q Were there any waivers signed with regard to the meeting of the board of directors to consider bankruptcy?

"A No.

"Q Were there any formal minutes, in the minute books of Verrazzano Towers, Inc., with regard to the filing of the bankruptcy petition?

"A No.

"Q What meetings did take place upon which this statement was based?

"A As I said before, the March 21st meeting, and the phone call to Mr. Riso on either that Friday or Monday, the 5th."

(Tr. September 22, 1980, p. 86, l. 24—p. 87, l. 17). It is thus undisputed that, contrary to Gherardi's statements in the certificate, no "Special Meeting of the directors of VERRAZZANO TOWERS, INC." was "held on the 5th day of May, 1980 at 10:00 in the forenoon of that day at the offices of the Corporation." The "Chairman" never "announced that a quorum was present and that a meeting had been called for the purpose of considering the filing of a petition . . .", there was no "due discussion", and no "motion" was "duly made and adopted in accordance with the By-Laws of the Corporation. . . ." Whether Gherardi

spoke with Riso on the telephone on May 5, 1980 concerning filing a petition for relief under Chapter 11 is disputed, but even if the call did occur, it would not cure the false statements in the certificate.

Gherardi signed the certificate as "President-Secretary". Whether he actually was president of the debtor is disputed. With regard to this question, Riso's direct examination follows:

"Q In 1974, were you president of Verrazzano Towers, Inc.?

"A I was.

"Q At any time from 1974 to date, have you ever resigned as president of Verrazzano Towers, Inc.?

"A I have not.

"Q Has there ever been a Board meeting at which you were fired as president of Verrazzano Towers, Inc.?

"A There was none."

(Tr. May 23, 1980, p. 28, ll. 13–21). On redirect examination, he testified as follows:

"Q Subsequent to the time the corporate resolution was signed for National Bank of North America, which is July 29, 1974. It says that you are the president and your brother is the secretary and Mr. Gherardi is the vice-president. Between April 29, 1974 (*sic*) until May of 1980, did you ever have a discussion with Mr. Gherardi as to changing the corporate officers?

"A No, sir.

"Q Did you ever tell Mr. Gherardi that he was elected president?

"A No, sir.

\* \* \* \* \* \*

"Q At any time up to the date of the filing of the petition, which was dated May 6, 1980, did you resign as president of Verrazzano Towers, Inc.?

"A I did not.

"Q Did your brother resign as secretary of Verrazzano Towers, Inc.?

"A He did not.

\* \* \* \* \* \*

"Q Did you ever resign, either directly or indirectly, in any manner, form or shape imaginable to the world, as president of Verrazzano Towers, Inc.?

"A No, sir.

\* \* \* \* \* · \*

"Q To the best of your knowledge and belief, was James C. Gherardi only a vice president of the corporation?

"A He was."

(Tr. September 8, 1980, p. 48, l. 7—p. 52, l. 4).

The documentary evidence supports Riso's contention that he, and not Gherardi, was president of the debtor. Debtor's Exhibit V is an agreement dated February 1, 1974 between the debtor and A. H. Salkowitz, an architect hired by the debtor to assist in the planned development of the property. Riso signed this agreement as president of the debtor, an act which Gherardi admits was authorized by the board of directors of the debtor with his full knowledge and consent. (Tr. September 22, 1980, p. 52, l. 23—p. 56, l. 7). The same is true of Debtor's Exhibit W, a corporate resolution of the debtor dated July 29, 1974 authorizing the opening of a corporate bank account at the National Bank of North America (Tr. September 22, 1980, p. 56, l. 9—p. 58, l. 24), of Debtor's Exhibit U, a corporate resolution dated November 26, 1973 authorizing the debtor to open an account at the Franklin National Bank (Tr. September 22, 1980, p. 59, l. 13—p. 61, l. 15); of Debtor's Exhibit B, the mortgage, dated April 17, 1974 from the debtor to the Diocese (Tr. September 22, 1980, p. 61, l. 16—p. 63, l. 5), and of Debtor's Exhibit C, the mortgage dated April 17, 1974 executed by the debtor in favor of Irving Rubin and Harold Pearlman (Tr. September 22, 1980, p. 63, l. 6—p. 67, l. 3). Riso also testified that he signed the mortgage from the debtor to the Diocese dated April 17, 1974 as president, (Flushing's Exhibit l, Tr. May 23, 1980, p. 27, ll. 14–24), an allegation not disputed by Gherardi. Riso also signed, as president, Debtor's Exhibit D, the deed dated April 17, 1974 transferring the property from the debtor to RGR.

Gherardi testified that he did not authorize this transaction (Tr. September 22, 1980, p. 67, l. 4—p. 68, l. 7). This contention is difficult to understand for two reasons: 1) The transfer to RGR is entirely consistent with his previous testimony that he and Riso had already agreed that such transfer would take place (Tr. September 22, 1980, p. 40, l. 5—p. 42, l. 17), and 2) it appears that he was present when this transaction occurred, as the deed is dated April 17, 1974, the same date as the closing, and Riso testified that Gherardi was present during all of the transactions on that date (Tr. September 8, 1980, p. 31, l. 17—p. 33, l. 25), which testimony is not disputed by Gherardi.

The only documents that show Gherardi to be president of the debtor are found in the petition for relief and the papers accompanying it. With respect to the execution of the officer's certificate, he gave the following testimony, on cross examination:

"Q Would you agree that Vincent Riso wasn't present when you signed it?

"A I definitely agree, Vincent Riso was not present when I signed it.

"Q Neither was his broth? (sic)

"A He wasn't present either.

"Q You signed it with no other member of the board of directors or stockholders or any other officers present; is that correct?

"A That's correct.

"Q Now, with regard to that document—

"THE COURT: You mean Exhibit 14.

"Q Exhibit 14, nothing in that document to indicate that there were (sic) a new set of officers elected to this corporation, is there?

"A I see nothing that says anything about a new set of officers.

(Tr. October 8, 1980, morning session, p. 27, l. 17—p. 28, l. 2). Thus, this document, unlike most, if not all of the others, was not signed in the presence of both Riso and Gherardi.

Earlier in his cross-examination, Gherardi gave the following testimony regarding the presidency of the debtor:

"Q I'm going to show you a series of exhibits. It is the entire transcript. With regard to Exhibit B, which is the mortgage from Verrazzano Towers to the Roman Catholic Diocese of Brooklyn. Isn't it a fact that you were physically present when Mr. Riso signed his name to that document as president of Verrazzano Towers? (Showing to the witness).

"A I was at the closing. Yes, I assume that this might be one of the documents that was signed, yes.

"Q You were also present when Mr. Riso signed as president of Verrazzano Towers the mortgage which ran to Irving Reuben (*sic*) and Howard Perlman (*sic*) which was executed also at the time? (Showing to the witness).

"A I was at the—

"Q You were also present and you also signed on November 26, 1973, as vice president the corporation resolution filed with Franklin National Bank, which is new (*sic*) in evidence, which names Vincent Riso as president of that corporation.

"A I assume that is a copy.

"Q You produce (*sic*) it; it is your exhibit. I'm saying isn't it a fact that you were physically present and you signed that resolution in which you signed as vice president and Mr. Riso signed as president?

"A Yes, I signed this as vice president.

"Q But you were present when Mr. Riso signed it as president?

"A I can't answer that. I don't know.

"Q You signed it as vice president, you concede that?

"A Yes, I would.

\* \* \* \* \* \*

"Q With regard to the corporation resolution filed with the National Bank of North America, isn't it a fact that you were aware that that resolution was filed and which Mr. Riso signed as president of Verrazzano Towers?

"A Yeah, I believe I was aware of that.

"Q Now, you testified on September 22, 1980, before this Court, that you were president of Verrazzano Towers. That is not true, is it?

"A What is not true? That I testified to that?

"Q That you were never president of Verrazzano Towers?

"A Not true. I was president when we originally agreed to put these corporations together. We had agreed that I would be the president of both Vigor and Verrazzano Towers.

"Q Mr. Gherardi, I am asking about Verrazzano Towers; I'm not asking about Vigor. Isn't it a fact you never were and you knew you never were the president of Verrazzano Towers?

"A That is not true.

"Q Here are four documents dated over a two-year period and not one of these documents show that you are president.

"A I'm saying to you when we first got together it was agreed that I would be president of both organizations.

"Q Do you have a bank resolution—Withdraw that. Isn't it a fact that the only bank, the first bank resolution in any bank account for Verrazzano Towers was November 26, 1973?

"A Yes, it's true.

"Q In that bank resolution you are vice president?

"A That is correct.

"Q In the second bank resolution, which is the 29th day of July, one year later, you are still vice president. Isn't that a fact?

"A That is correct.

"Q Isn't it a fact that in both mortgages dated April 17, 1974, Mr. Riso signed as president. Isn't that a fact?

"A That is correct.

\* \* \* \* \* \*

"Q Isn't it a fact that from November 23rd, 1973, until March 21st, 1980, Mr. Riso never resigned as president?

"A That is correct.

"Q That as far as the outside world is concerned Mr. Riso is president of Verrazzano Towers?

"A I can't answer to that question.

"MR. ROCK (Trial counsel for the debtor): Objection. When are we speaking?

"MR. ROTHMAN (Counsel for Flushing): November 26, '73 to March of 1980?

"THE WITNESS: I have no idea what the outside world thought.

"Q Have you any documents that will show that you expound (*sic*) to be president of Verrazzano Towers?

"MR. ROCK: Once again, objection. What period are we speaking of?

\*　　\*　　\*　　\*　　\*　　\*

"MR. ROTHMAN: November 26, 1973 to the alleged meeting in March 21, which he says in '80.

"THE COURT: That is the period of time we are talking about.

"THE WITNESS: The answer to that is I have to go through my records.

\*　　\*　　\*　　\*　　\*　　\*

"Q Mr. Gherardi, are you aware that one of the issues raised by the bank here is that you never were the president of Verrazzano Towers, Inc.; are you aware of that?

"A I assume if you are telling me that this is one of the issues that you raised.

"Q And you never knew it? I'm asking to find out what you knew.

"A I don't understand the question.

"Q Are you aware that when the petition was brought in this court to challenge the petition in bankruptcy, that the bank alleged that you never were president of Verrazzano Towers?

"A Yes.

"Q You have known that since May of 1980?

"A That is correct.

"Q Since that time to the present date, you never had the curiosity to determine whether you had any documentation in which your name appears as president; is that what you are telling the Court?

"A That is not the question that you asked. The question is you asked me, "Do I have anything that exhibits between the period of November and March 21st, anything." My answer to you is I do not know. I have not gone through my records.

"Q You are telling me that knowing that the issue was, one of the issues was whether you were president of Verrazzano Towers, you never looked to determine whether you had any documentation that would support your position?

"A That is what I said. I have not gone through my records."

(Tr. October 8, 1980, morning session, p. 6, l. 22—p. 13, l. 9).

Riso's testimony on this matter was clear and unequivocal; he was president at the outset and has been so ever since. This testimony is supported by all the documentary evidence except for certain documents accompanying the petition for relief, which Gherardi admits were executed by him not in Riso's presence. Gherardi further admits that Riso never resigned as president. He insists that he was the president of the debtor at the time of its creation, which was apparently in September of 1973, yet in the corporate resolution authorizing the opening of a bank account in the name of the debtor at the Franklin National Bank, dated November 26, 1973 (Debtor's Exhibit U) Gherardi is listed as vice-president; Riso as president. It is obvious to me that Riso was at all times the president of the debtor and that Gherardi's signing the officer's certificate accompanying the petition as "President-Secretary" thus constitutes yet another untruth in that document. He also appears to have assumed the office of secretary, which all the evidence indicates belonged to Raymond Riso (*See, e. g.* Debtor's Exhibits U and W).

■ To summarize, I find that the officer's certificate executed by Gherardi contains the following false statements: 1) that a special meeting of the debtor's board of directors was held at its offices on May 5,

1980, 2) that the board, in accordance with the appropriate formalities, resolved to file a petition for relief under Chapter 11, and 3) that Gherardi was president and secretary of the debtor. Although the burden of proof rests at all times upon the movant Flushing, I find that, by successfully establishing these facts, it has made out a prima facie case that considering only the allegations contained within the four corners of the petition for relief, Gherardi has fraudulently invoked the jurisdiction of this court by means of the above-described false statements. These false statements do not bear upon any question of the authority of the board of directors to file this petition; rather they establish, prima facie, that he did not have its authority to file the petition unilaterally. Thus, although the burden of proof remains at all times upon the movant Flushing, I find that the burden of going forward with evidence tending to show that the statements in the certificate were not false, or, in the alternative, circumstances showing why the false statements are permissible, rests with the debtor. *Berenyi v. District Director, Immigration & Nat. Serv.*, 352 F.2d 71, 73 (1st Cir. 1965) aff'd 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1966).

There are, of course, numerous contentions by Gherardi in furtherance of discharging this burden. Most important is Gherardi's contention that Riso consented to the filing of this petition for relief at the March 21, 1980 meeting.

An examination of events prior to this meeting reveals that, at least since October 21, 1975, Riso and Gherardi have not, as originally planned, worked together for the purpose of developing the property; rather, they have devoted their efforts toward finding a mutually agreeable manner of dissolving their association, and the entities embodying it. As outlined above, some time between April 17, 1974 and October 21, 1975, RGR fell into default on its mortgages. It further appears that during this period Riso and Gherardi ceased meeting regularly and Gherardi stopped occupying space in the Risos' Bell Boulevard office. On October 21, 1975, they commenced an action against Gherardi accusing him of jeopardizing RGR's equity in the property by failing to contribute his share to its maintenance and development (Flushing's Exhibit 8). Gherardi counterclaimed, alleging generally that the Risos had refused to execute a written agreement, which they had previously orally agreed to, under which all the parties' future real estate transactions would be conducted jointly and that the Risos had wrongly disclosed the fact that he had been unable to contribute $150,000 to the parties' combined businesses as he had previously agreed (Flushing's Exhibit 9).

In the stipulation settling the lawsuit, the Risos and Gherardi seemingly achieved a framework for disentangling their association. Stated briefly, Gherardi would pay $82,000 to the Risos, Riso would negotiate with Flushing for cash, to be divided between the Risos and Gherardi, in exchange for RGR's title to the property, and RGR would be dissolved with appropriate releases. The $82,000 was paid and the deed and releases between the Risos and Gherardi were executed and placed in escrow. Although Riso negotiated a deal with Flushing by which the Risos and Gherardi would receive $50,000 each and the creditors of RGR would be satisfied, Gherardi refused to release Flushing, probably due to his reluctance to give up any rights he felt he may have had against it. A series of motions ensued, finally resulting in Justice Hammer's order of October 31, 1978 directing Gherardi to deliver the deed to the property, held in escrow by Robertson, to Riso's attorney, along with a certificate of dissolution of RGR (Flushing's Exhibit 15). The deed was never turned over and Flushing ultimately was granted summary judgment in its foreclosure action. It appears that only Gherardi, and not the Risos, defended and appealed Flushing's foreclosure action (Affidavit of Jessel Rothman, Esq., pages 1–2, accompanying Flushing's Order to Show Cause dated May 13, 1980; Tr. October 10, 1980, morning session, p. 64, l. 21—p. 65, l. 3). Soon thereafter, the March 21, 1980 meeting took place.

Gherardi arranged this meeting for the purpose of proposing to the Risos that a petition in Chapter 11 be filed. Riso described the meeting in the following manner:

"Q Assuming that it took place in 1980, do you know where it took place?

"A It took place in my office.

"Q Can you tell me who was present?

"A Myself, my brother and Mr. Gherardi.

\* \* \* \* \* \*

"Q What did you say, what did you brother say and what did Mr. Gherardi say?

\* \* \* \* \* \*

"A Mr. Gherardi said that he felt that the best way to protect our interest in the property was to file the bankruptcy. In that manner, possibly save what investments we collectively had in the property. I said that I would want to get the advice of my attorney and while Mr. Gherardi was asked to step out of the room, I contacted my attorney and was advised that—

"THE COURT: Don't tell us what your attorney said to you. Tell us what you told Mr. Gherardi.

"A After consultation with my attorney, I told Mr. Gherardi that I would not participate in the foreclosure action.

"THE COURT: Not the foreclosure action.

"THE WITNESS: The bankruptcy petition, as a result of my conversation.

"THE COURT: With your attorney.

"THE WITNESS: With my attorney.

"Q What else was said?

"A Mr. Gherardi again asked me to reconsider and I told him that I felt the matter was closed unless he could come up with a solution that would be acceptable on my brother (sic) and my behalf, acceptable to my attorney.

"Q Was you brother also present?

"A He was.

"Q Did he hear what you told Mr. Gherardi?

"A He did.

"Q Did he, in any manner, indicate to Mr. Gherardi that he concurred with your opinion?

"A I don't recall if he said so, indicated it verbally or by his non—

"Q By his silence?

"A By his silence.

"Q Did Mr. Gherardi ever ask him, do you concur with Vincent's opinion?

"A I don't recall.

"Q Are you telling us, to the best of your knowledge, at this time, the sum and substance of that meeting, to the best of your knowledge?

"A I am.

"Q Can you tell me approximately how long that meeting took place?

"A As best as I can recall, approximately ¾ of an hour."

(Tr. September 8, 1980, p. 43, 1. 4—p. 46, 1. 17). Gherardi described the same meeting in the following manner:

"Q Were there any meetings, which took place, in which the petition in bankruptcy was discussed?

"A Yes there were.

"Q When did that take place?

"A That took place in March of 1980.

"Q Who was present at that time?

"A Raymond and Vincent Riso.

"Q Will you please tell the Court what you said to them, and what they said to you?

"A The meeting started earlier, about 9:30 in the morning.

"MR. ROTHMAN: Where.

"THE WITNESS: At Mr. Riso's Office on Bell Blvd. The same office that all of these meetings took place.

"THE COURT: You then had a desk space there?

"THE WITNESS: No, I no longer had desk space, your Honor. I hadn't occupied space there for at least four years.

"THE COURT: Oh.

"THE WITNESS: I made an appointment with Mr. Riso. When I got there, both Raymond and Vincent Riso were there.

"We sat down, and discussed the fact that there was a foreclosure sale imminent. This was an extremely valuable asset that would be available in some manner, shape or form.

"That meeting extended two and a half to three hours.

"At that point, Mr. Riso explained to me that he was very, very involved with the Flushing Savings Bank. Yet on the other hand, he had a tremendous amount of money involved here. There were other people he felt obligated to, Mr. Salkowitz; and that in some manner, shape or form, we would have to do something.

"He felt he could resist the bank. I asked him very bluntly, can you resist the bank? He said, I'm a free agent, I can do whatever I want. I said, fine. And my advice here, is to simply transfer this and file for a Chapter XI (sic).

"He felt that this was the only course available. We had discussed this, as a matter of fact, some three years earlier when the Diocese owned it, and we came to the conclusion that perhaps then we should do something to protect it.

"THE COURT: You mean, when the Diocese had the mortgage?

"THE WITNESS: Yes, we were negotiating with them. Over the years, we brought them many propositions.

"But as time went on that morning, what happened was, Mr. Riso finally said to me, I can't do this. I just can't do this. I want to resist it. I realize it's in everybody's interest, but they got me with my hands tied. I'm absolutely tied. He said, the only thing we can do is, transfer the responsibility to you, and you take over the corporation, and you put it into Chapter XI, and you'll have to take the brunt of it all.

"He said, there's no way. These people have me tied hand and foot. He said, I have this fire, and it held up my operations. We don't know whether it (sic) going to go ahead. We lost building plots, and we have all sorts of problems. He said, very frankly, the bank has problems. There's all sorts of problems.

"I said, I don't understand what goes on here. I said, you're there and you're a partner, why can't you. I said, I made overtures, I brought some people in and they don't want to talk to us. They just want all cash. The mortgage market, at that point, prime was up around 18 or 19 per cent. Nothing could come out of it.

"So we came out of it and he said, you have to do what you have to do on your own. I can't help you. He said my hands are tied by these people. This bank has got me locked up. He said, I could go broke over there. He said, there's no way for me to fight.

"He said, I want to fight this thing. I believe there's value there. He said, there's certainly a little time to breath (sic) and with the right kind of situation, there is money to be salvaged there for all of the interested parties, but there is nothing I can do.

"He said, you'll have to take over the corporation. You become the president, and you do what you have to do. He said, you put it into Chapter XI.

"That's when I left that meeting, and I knew I was—We started off the meeting where we was (sic) going to work diligently, and again he said, there is nothing I can do. My hands are totaly (sic) tied, he said.

"That was the sum and subtance (sic). That meeting lasted almost three hours. We didn't break up until about 12:00. From 9:30 until 12:00. That was the sum and subtance (sic) of the meeting."

(Tr. September 22, 1980, p. 70, l. 22—p. 75, l. 7).

I am thus faced with a clear issue of fact: whether or not Riso told Gherardi to file this petition for relief at the March 21 meeting. For the following reasons, I do not believe that Riso ever consented to the petition: First, virtually none of Riso's efforts regarding this property for a period of over four years before this meeting have been toward the end of developing the property together with Gherardi. That plan failed approximately one year after RGR acquired the property, and there is no evidence before me tending to show that there were ever any serious discussions about Riso and Gherardi burying the hatchet and making a renewed effort to develop it together. Rather, they settled their lawsuit on December 13, 1977 by agreeing upon a framework through which, ultimately, the property would be deeded to Flushing, and RGR would be dissolved. Unfortunately, the stipulation was never fully carried out. This led to further legal proceedings again pitting Riso and Gherardi against each other. These disputes have not, to this day, been resolved, as evidenced by the fact that Riso and Gherardi have offered strikingly different testimony at the hearing of the instant motion.

Why, in light of the virtual abandonment by Riso, sometime in 1975, of any hope of developing this property with Gherardi, followed by approximately five years of acrimonious legal proceedings, would he suddenly, in 1980, agree to attempt to reorganize the debtor with him? It seems far more reasonable to me that in view of their antipathy to one another, he would decline to join Gherardi in any effort to attempt to develop the property under the protection of this court in a proceeding under Chapter 11 of the Bankruptcy Code. No evidence has been introduced which would lead me to believe otherwise.

Gherardi's conduct after March 21, 1980 further supports my conclusion that there was never a sudden meeting of the minds between Riso and Gherardi at the meeting on that date. Gherardi testified that between March 21 and April 7, 1980, when the deed and petition were actually executed, he contacted Franklin Rand Weiss, Esq. for the purpose of the preparation of the petition for relief (Tr. September 22, 1980, p. 76, l. 13—p. 77, l. 5). In describing his discussions with the Weiss firm concerning its preparation, he testified as follows, on cross-examination:

"Q Did they say in order to file a petition in bankruptcy there must be a board of directors meeting?

"A Yes, that came up.

"Q What did you tell them?

"A I told them that I met with the two Risos and I told them of a long and lengthy meeting that we held on that Friday, and the outcome of that was that the Risos allowed me as seeing as they could do nothing. . . ."

(Tr. October 8, 1980, morning session, p. 18, ll. 6–13). It is thus Gherardi's position that it was clearly understood among him and his attorneys that the meeting at which the board authorized the petition for relief occurred on *March 21, 1980.* Why then, in the president-secretary's certificate do they allege that the meeting took place on *May 5, 1980,* a date when, at trial, Gherardi testified that he merely called Riso on the telephone to notify him that he was going to file the petition (Tr. September 22, 1980, p. 80, l. 24—p. 82, l. 25); a call which Riso insists he never received (Tr. September 8, 1980, p. 52, ll. 5–15)? The May 5 telephone call is hardly significant not only because no formal meeting occurred, but also because the deed and petition had already been prepared by Weiss on April 7 and would have been filed then had Flushing's foreclosure sale not been postponed for a month. Thus the May 5 telephone call has not even colorable significance. What possible reason, then, would Gherardi have for representing to this court that the meeting authorizing the filing of the petition took place on May 5 rather than on March 21, when, he testified, a three hour meeting had taken place at which the three directors of the debtor who were partners in RGR were present and at which they all agreed to the filing of this petition?

Along with this contradictory conduct, a comparison of the petition itself with the arguments made by the debtor, actually Gherardi, in its various memoranda of law, reveal further inconsistencies. In an affidavit, dated May 5, 1980 accompanying the petition, Gherardi states, in paragraph 10, that the "[d]ebtor has now attracted new capital to the venture." In subparagraph (c) of the preceding paragraph, Gherardi states that "[t]he gross monthly rentals from the existing building on the real property is *(sic)* approximately $1,000 and it is estimated that the debtor will operate at a *break-even figure* during the next (30) days." (emphasis added). These quotations from Gherardi's affidavit clearly indicate that a traditional arrangement of the property is contemplated, much like those under Chapter XII of the former Bankruptcy Act of 1898, 11 U.S.C. § 801 *et seq.* In the post-trial memorandum of law dated November 17, 1980, however, it is stated on more than one occasion that "[i]f the real estate could be *sold* through an orderly procedure under a plan in bankruptcy, all creditors could be paid and the principals could recover most, if not all, of their investment." (*See e. g.* p. 15) (emphasis added). This would appear to be a reference to Section 1123(b)(4) of the Code, 11 U.S.C. § 1123(b)(4), a new provision which states that a Chapter 11 plan may "provide for the sale of all or substantially all of the property of the estate . . . ." This provision, not contained in the prior bankruptcy act, has been referred to as authorizing a "liquidating 11." Is reorganization sought, or an orderly liquidation under Section 1123(b)(4)? As to the debtor operating at a break-even point with income of $1,000 a month, considering the fact that the two mortgages held by Flushing, which are hopelessly in arrears, total $1,325,000, it cannot be said that the debtor's total monthly income is sufficient to cover the monthly charges for interest, as it accrues, without taking into consideration the charges for real estate taxes as they come due on the property. The debtor's total monthly income of $1,000 is hardly "a break-even figure."

It is thus apparent that there are inconsistencies and contradictions in Gherardi's testimony and affidavits. His demeanor on the witness stand was unimpressive. His testimony was unconvincing, halting, equivocal and evasive. Riso, on the other hand, testified in a clear, convincing, forthright manner and I believe his testimony that he has always been president of the debtor, that he never consented to the transfer of the property from RGR to the debtor or to the filing of the petition and indeed, that he never knew it had been filed until some days after the event (Tr. September 8, 1980, p. 52, ll. 5–18).

There is another argument made by Gherardi concerning Riso's credibility which I shall now discuss although I believe the above discussion to be dispositive of the question of whether Riso or his brother consented to the filing of this petition on March 21, 1980. That is that Riso should not be believed due to a joint venture in which he and Flushing are involved which created a conflict of interest between his loyalty as a director of the debtor and his interest in the joint venture. The joint venture, called Doug Park Associates ("DOUG PARK"), was formed in March of 1978 for the purpose of purchasing a parcel of real estate in Douglaston, Queens, and building and selling approximately 105 dwelling units (Debtor's Exhibit K). The joint venturers were FSB Properties, Inc. ("FSB"), a wholly owned subsidiary of Flushing, and Rayfield Properties, Inc. ("RAYFIELD"), a New York corporation, the principals of which are Vincent Riso and Raymond Riso and an individual named Peter Gray (Tr. September 5, 1980, p. 26, l. 13—p. 27, l. 19; p. 30, ll. 9–21). The joint venture agreement (Debtor's Exhibit K) provides that Rayfield would purchase the property and FSB would provide the capital necessary for the development of the project. The joint venturers would share equally in all assets, profits, liabilities and losses. Article IX of the agreement is entitled "Insurance Requirements" and requires the joint venture to carry, among other things, fire insurance. On November 8, 1978, Riso executed a document entitled

"Guaranty of Completion" in which he individually guaranteed "fully and faithfully [to] oversee the completion of the building(s) described in said building loan agreements according to the plans and specifications referred to in said agreements, as modified and subject to the terms and conditions as hereinafter provided for" (Debtor's Exhibit T). One of these conditions upon Riso's performance was that "Riso shall not have any obligation hereinunder if the construction of the 105 condominium dwelling units is delayed or not completed, as the result of . . . fire . . . not reasonably anticipated . . . or by any cause or causes beyond the reasonable control of Vincent L. Riso, or by delays authorized by the owner. . . ." (*Id.*)

On September 11, 1979 a disastrous fire occurred at Doug Park, destroying whatever construction had taken place, and refunds had to be made on the 22 homes which had already been sold (Tr. September 5, 1980, p. 70, l. 10—p. 71, l. 8). Although Riso, on behalf of Doug Park, wrote to FSB on April 11, 1980 (Debtor's Exhibit S) proposing a plan for renewed construction at the site, no construction has taken place since the fire. George C. Byrnes, president of Flushing, testified that to, the best of his recollection this proposal had not been approved by FSB (Tr. September 10, 1980, p. 77, ll. 4–14). Doug Park, according to the testimony of William L. Hartnett, Jr., an officer of Flushing, owed Flushing nearly three and a half million dollars, which is a combined figure of amounts owed on the building loan and the land loan (Debtor's Exhibits Y and Z; Tr. September 22, 1980, pp. 2–36).

It is Gherardi's testimony that Riso, at the March 21, 1980 meeting, took the position that although he supported the filing of this petition, he was afraid to take any action which might be displeasing to Flushing, because then it might not go ahead with Doug Park. Riso thus supposedly insisted that only Gherardi's name appear on the petition for relief. I find this argument entirely unpersuasive. First, it is clear from the Doug Park joint venture agreement (Debtor's Exhibit K) that Flushing

has just as much to lose in Doug Park as the Risos and Gary; it has almost three and a half million dollars tied up in the project. Second, despite Gherardi's contention to the contrary, it is clear that Riso had no personal liability under the "Guaranty of Completion" (Debtor's Exhibit T) since the delays had been caused by the fire, and by the owner. There is thus no evidence tending to show that Riso had reason to fear Flushing's "clout" in the Doug Park joint venture. Finally, Gherardi's argument is unsound in that it exalts form over substance. If Riso was truly afraid of Flushing due to his involvement with the Doug Park venture, it would make no difference whose name appeared on the petition for relief. The Risos, or at least one of them, as members of the Board of Directors of the debtor, would have had to approve the filing of the petition, thus incurring the wrath of Flushing. I find nothing in the evidence adduced concerning Doug Park Associates which supports Gherardi's position.

There is further evidence in the record that Gherardi has acted improperly in connection with the preparation and filing of this petition for relief. It will be recalled that on May 5, 1980, Gherardi, without the knowledge or consent of his partners, transferred the property from RGR to the debtor. It is questionable whether he had the authority under the New York Partnership Law to make the conveyance, or whether he even had a transferable interest in the property on that date.

◼ Section 20(2) of the New York Partnership Law (McKinney's Consolidated Laws, Book 38) provides that "[a]n act of a partner *which is not apparently for the carrying on of the business of the partnership in the usual way* does not bind the partnership unless authorized by the other partners" (emphasis mine). Subsection (3) provides that "[u]nless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to . . . (c) Do any other act which would make it impossible to carry on the ordinary busi-

ness of the partnership." Clearly, Gherardi's transfer of the sole asset of RGR without the consent, or even the knowledge, of the Risos, contravenes these provisions of the Partnership Law. The transfer thus did not bind the Risos, as it was not "for the carrying on of the business of the partnership in the usual way . . .", and was without authority because it made it "impossible to carry on the ordinary business of the partnership."

■ Gherardi's unilateral transfer also contravenes Section 51(2)(b) of the New York Partnership Law which provides that "[a] partner's right in specific partnership property is not assignable except in connection with the assignment of the rights of all the partners in the same property." In *Commissioner of Internal Revenue v. Whitney*, 169 F.2d 562 (2d Cir. 1948), the court referred to both of the above sections of the New York Partnership Law in the following quotation which appears at page 567:

"Accordingly the assent of all the partners is necessary in order to dispose of the good will of the business, or to do any act making it impossible to carry on its ordinary business, or to assign a partner's right in specific property of the firm. N.Y.Partnership Law, § 20, par. 3(b, c); § 51, par. 2(b). See *[Klumpp] v. Gardner*, 114 N.Y. 153, 21 N.E. 99; *Postman v. Rowan*, 65 Misc. 50, 119 N.Y.S. 248; *Freeman v. Abramson*, 30 Misc. 101, 61 N.Y.S. 839. Here the sale to the corporation could not have been validly accomplished without the express assent of the thirteen partners. . . ."

*See also* New York Partnership Law Sections 40(5) and 50(a) and (c).

Even when the question of Gherardi's authority as a partner to consummate this transfer is put aside, it nonetheless further appears to be highly questionable whether he had any transferable interest in the property. It will be recalled that on December 13, 1977 the Risos and Gherardi settled their Supreme Court, Queens County action by entering into a stipulation under which, *inter alia*, Gherardi would pay $82,000 to the Risos, Riso would negotiate with Flushing for cash in exchange for a deed in lieu of foreclosure of the property, and the parties would execute such a deed in favor of Flushing. Gherardi's attorneys were to hold the deed in escrow until the other aspects of the stipulation were carried out and were to deliver it upon 24 hours notice. Without going into the question of whether either side violated any of the other terms of the stipulation, if indeed any such question exists, demand for the deed was made upon Robertson, but he refused to deliver it. This led to the motions described above leading ultimately to Justice Hammer's Order dated October 31, 1978 (Flushing's Exhibit 7), ordering that the deed be delivered to the attorney for the Risos, the plaintiffs. That order was *submitted by Robertson* who testified as follows with regard to its import:

"Q Your order was signed?

"A That's right.

"Q Would it be fair to state that the import of Mr. Justice Hammer's decision was that a deed was to be delivered to the attorney for the plaintiffs?

"A That is what it orders.

(Tr. October 10, 1980, afternoon session, p. 24, ll. 9–14). That order has not been rescinded or modified in any way. Robertson, in fact, appears to be of the opinion that he was in violation of the order, as evidenced by his testimony that he was holding the deed in order to precipitate a contempt proceeding against him at which testimony could be taken (*Id.*, at p. 29, ll. 8–12).

■ Under these circumstances did Gherardi have a transferable interest in the property on May 5, 1980? A valid escrow requires delivery of the instrument by the grantor to the "escrow agent" or depositary, and the subsequent delivery by the depositary to the grantee must be conditioned upon the happening of some event(s). *Fargo v. Burke*, 262 N.Y. 229, 233, 186 N.E 683 (1933); 20 N.Y.Jur.Rev., Escrow, §§ 5–11 (1976). Title does not pass to the grantee until the happening of the event(s) contemplated in the escrow agreement. *Mechanics' Nat. Bank of Providence v.*

*Roughead*, 76 A.D. 534, 78 N.Y.S. 800, 809 (4th Dept. 1902) *aff'd sub nom. Mechanics' Nat. Bank of Providence v. Jones*, 175 N.Y. 518, 67 N.E. 1085 (1903); 20 N.Y.Jur.Rev., Escrow, §§ 15–19 (1976).

Here in the escrow agreement entered into before Justice Hammer in the December 13, 1977 stipulation, Robertson's firm was the depositary, and the events were the terms of the stipulation. The delivery to Robertson was made by the Risos and Gherardi and the events triggering Robertson's obligation to release the deed had occurred. The fact that Justice Hammer issued an order that the deed be turned over to the Risos' attorney pursuant to the stipulation leaves no doubt that, in Justice Hammer's opinion, the necessary events had occurred such as to ripen Robertson's obligation to deliver the deed. Robertson apparently agreed, as evidenced by his expectation of a motion to punish him for contempt.

█ Under these circumstances it appears that Gherardi had no transferable interest in the property on May 5, 1980. The events contemplated in the escrow agreement created in the December 13, 1977 stipulation had occurred ripening Robertson's duty to release the deed upon demand, and casting serious doubt, in my opinion, upon the power of the grantors, or *a fortiori* any one of them, to convey the property subsequently.

I find that these further examples of Gherardi's improper conduct support my finding that he has fraudulently invoked jurisdiction of this court by making materially false statements in the petition for relief and accompanying documents filed in this court on May 6, 1980.

Gherardi further contends, however, that even if it is found that the Risos did not consent to the filing of this petition for relief, the filing was nevertheless a valid corporate act because the Risos held interests adverse to their fiduciary duties to the debtor which precluded them from participating in the decision. Gherardi contends that Riso breached his fiduciary duty to the debtor when he entered into discussions with Flushing concerning the possibility of developing the property with it on a joint venture basis. It is clear from the record, and undisputed by Riso, that he discussed the possibility of such a venture with Flushing (Debtor's Exhibits L, M, O and FF; Tr. September 5, 1980, p. 34, l. 20—p. 43, l. 4). No such contract or transaction, however, has ever been executed between them.

Section 713 of the New York Business Corporation Law, enacted in 1971 (McKinney's Consolidated Laws, Book 6), entitled "Interested directors", recognizes two situations in which a conflict might arise such as to render a contract or transaction involving a director voidable: 1) a contract or transaction between a director and the corporation, or 2) a contract or transaction between two corporations which have directors in common. The provision liberalized prior law in that such dealings are no longer automatically void, but are rather voidable depending upon whether the other requirements of the section, dealing with full disclosure and voting, are complied with. *See, generally* 3 White on New York Corporations (13th Ed.) ¶ 713.01.

█ Gherardi contends that it makes no difference whether Riso consented to this petition for relief because his vote in any such matter was not necessary due to his discussions with Flushing concerning a possible joint venture of the property. He has cited numerous cases in support of this proposition, none of which I find convincing. The cases that deal with the question of votes by interested directors predate BCL § 713. *See e. g., Munson v. Syracuse*, 103 N.Y. 58, 8 N.E. 355 (1886). Furthermore, even if an agreement between Riso and Flushing would have disqualified him from voting, no such agreement ever came into existence.

Finally, and most importantly, I find that Gherardi's improper conduct is dispositive of this issue. He left the March 21, 1980 meeting knowing that the Risos opposed filing a petition for relief. He nevertheless, and in secret, pursued the course of conduct, discussed in detail above, which led to the improper commencement of this pro-

ceeding. If anyone has breached his duty to the debtor, it is Gherardi, who, without the knowledge or consent of the other two directors of the debtor, caused the petition for relief to be filed in this court commencing this Chapter 11 proceeding. Accordingly, Flushing's motion to vacate and dismiss the petition for relief is granted.